The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff-Appellee,

v.

MILLER BREWING COMPANY, Defendant-Appellant.

No. 85–1125.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 22, 1985.

Decided May 6, 1986.

Richard E. Reilly, Gimbell, Gimbell & Reilly, Milwaukee, Wis., for defendant-appellant.

Richard M. Esenberg, Foley & Lardner, Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.

COFFEY, Circuit Judge.

Miller Brewing Company ("Miller") appeals from a district court decision, after a five-day trial to the court, finding it liable to the Prudential Insurance Company of America ("Prudential") pursuant to the terms of a Group Insurance contract in the amount of $854,555. We affirm.

I

The dispute between Miller and Prudential arises over the amount of money that Miller allegedly owes Prudential on a group insurance policy issued by Prudential in April, 1978. This Policy included coverage for both group life (AD & D) and group health (A & S/DBL) insurance. In order to understand this dispute, some commonly used terminology in the insurance industry must initially be set forth. The conventional method of funding a group mutual fund insurance plan provides that the insured pays a premium, normally on a monthly basis, composed of three elements: (1) anticipated claims (paid claims and incurred claims); (2) a "retention" figure, which is the insurance carrier's cost of doing business (including administrative expenses, state premium taxes, risk charges, profit and interest); and (3) a "margin" to cover the possibility that actual claims may exceed anticipated claims. At the end of each normal policy year the mutual fund insurance carrier's board of directors calculates a dividend, if any that is to be paid to the policyholder. The dividend is arrived at according to an established formula and represents the amount of the premium payments, determined pursuant to the conventional method of funding, that exceeds actual claims paid out by the company plus its retention charge. Of course, there will be no dividend payment if the amount of the claims paid out by the insurance company and its retention charges exceed in any given year the premium payments made by the insured during that year; the insured will not have to make additional payments for that particular year since the maximum amount of the premium payments is determined annually in advance pursuant to the premium computation clause contained in the policy.[1] On the other hand, if at year end the insurance company has made a profit, the dividend payment is made to the policyholder. The policyholder has, in effect, reimbursed the insurance company for actual claims paid plus the company's retention charge since the amount of the normal monthly premium paid to the insurance company also includes a "margin" (in addition to the claims and retention charges)[2] and this "margin" will in a normal year be returned to the policy holder at the end of the policy year as part of the dividend. Since the insurance company holds the insured's money represented by the "margin" paid during the normal policy year, the group insurance plan funded under the conventional method usually results in a significant cash flow advantage to the insurance carrier, while at the same time the policyholder suffers a corresponding cash flow disadvantage in that it does not have the use of its money during that policy year.

In mid-1976, in order to increase its cash flow, Miller desired to change its group insurance coverage, then funded through the conventional billing method. Miller retained Hewitt & Associates ("Hewitt") as a consultant to assist in selecting a new group insurance carrier. Hewitt prepared premium funding specifications based on a "flexible funding" concept and sent the specifications to the potential bidders. Flexible funding was defined in the bid specifications as, "the insured will pay your retentional charges, excess mortality and claims paid for the month up to the aggre-

---

1. The insurance company may, depending on the particular policy language, raise the premium in subsequent years to cover any loss.

2. As explained previously, the margin represents that part of the premium charge covering the possibility that the actual claims may exceed the anticipated claims during the policy year.

gate limit of what premium charges would have been."

Prudential submitted a proposal dated November 14, 1976 containing a quote under the "cost plus" or flexible funding provision of the proposal.[3] The Prudential proposal included a projection of what Miller's retention charge would be, and the language of the proposal cautioned that the projected retention figures were only estimates and that various factors might influence the retention costs significantly:

"Depending upon the growth (or decline) in the number of insurers, and in changes in composition of the group, actual retention at year-end could differ substantially with that projected by the carrier at the beginning of the year."

The proposal also quoted various premium rates for life insurance and accidental death and dismemberment insurance. Joseph Young, Miller's manager of employee benefits and personnel from Hewitt were given the proposals submitted by the insurance carriers to review. On July 30, 1977, Miller officially selected Prudential to provide the requested coverage and in September, 1977, the policy for group life, health and accident insurance went into effect for all of Miller's employees.

On April 14, 1978, Prudential issued, and Miller accepted, a group insurance policy retroactive to July, 1977. The Policy provided the same premium rates as quoted in the proposal. The Policy also stated:

"The premium due on each premium due date is the sum of the premium charges for the insurance then provided under the coverage of the group policy, determined from the applicable premium rates then in effect and the employees insured at the periodic intervals established by Prudential. Premiums may be computed by any other method mutually agreeable to the policyholder and Prudential which produces approximately the same amount."

The policy also stated that the terms of the Policy comprised the entire agreement between the parties and the policy's signature page provided that the agreement "supersedes any previous application."

The Policy provided a lag period of six months to allow Prudential to calculate the dividend, if any, that was owed to the policyholder. In September of each year, following the calendar year-end, Prudential presented Miller with an annual report reconciling the monthly payments made by Miller with the contract premium owed to Prudential less the dividend calculated by Prudential. Miller would owe the difference between the sum of its monthly remittances and the contract premium less the dividend paid out.[4]

3. Mr. Young and Mr. Naughton, the Miller employees charged with the responsibility for overseeing the benefit program, testified at trial that they understood the term "cost plus" to mean flexible funding. As previously noted, flexible funding was defined in the Prudential proposal as retention charges plus claims paid, with a maximum payment limit of the premium charges computed under the conventional funding formula.

4. The following example illustrates how Prudential calculated the amounts owed under the contract.

| | | |
|---|---|---|
| Premium Due under the contract for the year: (# of employees covered multiplied by insurance rate/employee) | | $100 |
| *Less:* Dividend declared by the Board | | |
| Premium Due under the contract: | $100 | |
| *Less:* Total claims incurred: | (70) | |
| Actual Retention | (15) | |
| (Total of Administration Expenses, State Premium Taxes, profit charge and interest) | 15 | (15) |
| *Amount Due under the Contract* | | $ 85 |
| *Less:* Amount actually paid by Miller during the year under flexible funding method of payment. | | |

For calendar year 1978, Prudential's annual report of Miller's insurance account reflected that Miller owed Prudential approximately $4,000 and Miller paid that amount. In the four succeeding years, the annual report presented to Miller reflected increases in the amounts owed to Prudential from $50,024 for calendar year 1979 to $250,353 for calendar year 1982; the four-year amount of delinquent premiums totaled $691,054. This increase was due to a great number of variables affecting operating expenses, including providing coverage for a greater number of employees, the processing of claims for these Miller employees, an increase in the risk and profit charges, and various interest adjustments to Miller's account.[5] (Tr. 200–245, 257). Believing it had been paying its entire premium due under the policy when it remitted the payments covering the actual claims made plus the retention charges listed in the billing worksheets on a monthly basis, Miller contacted Prudential in January 1981 and questioned the calculations of the amounts owed for the calendar year 1979 and 1980. After failing to resolve the dispute over the amounts due under the contract, Miller formally informed Prudential in January 1982 that it did not intend to pay the amounts for 1979 through 1982 requested in the annual reports, contending that it had payed the entire premium due under the Policy when it made its monthly premium payment. Prudential then commenced this action seeking reimbursement for the alleged delinquent premium payments.

At trial, Mr. Young, the person responsible for negotiating the insurance contract on behalf of Miller, testified that he reviewed the Policy only for accuracy regarding the benefit levels. He referred to the rest of the Policy as "boilerplate" and, because he had not read the remainder of the Policy, testified that he was not aware of the premium rates provided in the Policy. Based upon his understanding of "flexible funding," Young testified that he believed Miller would never be liable for anything other than claims plus retention, and that what normally would constitute the "premium" under a conventionally funded policy would instead merely be a maximum liability "cap" under the flexible funding arrangement.[6] Thus he believed that Miller

| | | |
|---|---|---|
| Reimbursement for claim paid: | $ 70 | |
| Estimated retention: | 5 | $ 75 |
| *Net Amount owed by Miller at year end* | | $ 10 |

---

**5.** Kaminsky, Prudential's employee in charge of calculating the dividend, testified that at a meeting with Miller officials in 1980, he explained that the retention estimates were inadequate to cover actual retention charges. Miller did not want to increase the retention payments during the year and Kaminsky explained that this would necessitate a substantial increase in payments at year-end to cover the amount of unpaid retention charges.

**6.** The trial court made the following finding with respect to flexible funding:

"'Flexible funding' is a billing mechanism for the payment of premiums on a conventional group policy which maximizes cash flow for the policyholder by reversing the cash flow advantage normally obtained by the insurance company under the usual method of funding. Rather than pay a premium which includes a margin for the possibility that actual claims may exceed expected claims, the policyholder pays the insurance company a monthly premium to cover the actual claims theretofore paid by the carrier, plus an estimated monthly retention. At the annual accounting at the end of each year, an additional charge (or refund) is made for the carrier's actual retention based upon the carrier's current dividend formula. The policyholder's maximum liability is limited, however, to the premium specified in the Policy." Miller does not dispute that the court's definition of flexible funding is not the correct definition of flexible funding used in the insurance industry today. Rather, as discussed later in this opinion, Miller asserts that in 1977, when the contract was negotiated, it believed that under a flexible funding contract it would be liable only for the actual claims paid plus the monthly retention charges, and would not be liable for the premium specified in the Policy.

Since the trial court's findings of fact are reversible only if they are "clearly erroneous," Fed.R.Civ.P. 52; *Moody v. Amoco Oil Company,* 734 F.2d 1200, 1214 (7th Cir.1984), and since Miller does not argue that this is not the current definition of flexible funding in the insurance

would be liable for the conventional contract premium only if the sum of the total of claims plus retention equaled that amount.

Mr. Naughton, also a Miller employee, was responsible for the implementation of the change in insurance carriers at Miller and for the completion of the monthly billing work sheets, provided by Prudential, listing the claims paid by Prudential and the estimated retention figure. He testified that he understood flexible funding to mean "payment of claims plus retention," and that he believed that the total premiums due pursuant to the contract were only the claims plus retention as computed on a monthly basis. At the top of billing work sheet that he completed, Naughton would include the total premium due under the contract by multiplying the insurance rates times the number of employees covered under the group life, health and accident insurance plan. Naughton testified that he believed this figure only to represent Miller's "cap" or maximum liability under the contract if claims plus retention exceeded this figure and not the amount of Miller's actual liability under the Policy.

It was disclosed at trial that the Prudential Policy and its proposal were never read in depth, much less scrutinized, by either Young, Norman Naughton, or anyone at Hewitt; in fact they admitted at trial that they merely "skimmed" the proposal, and failed to read the cautionary language contained in Prudential's proposal that the retention figures were subject to change. (Tr. 348, 373, 428–29).

The district court, after a six-day trial, concluded that "the Policy is the complete contract between the parties." It further found that:

"The Policy was fully integrated and unambiguous in providing that Miller was to pay premiums at the rate set forth therein to be offset by whatever dividend might be declared by Prudential's Board of Directors in accordance with Prudential's current dividend formula."

At trial, Miller attempted to introduce evidence as to the lack of reasonableness of the retention charges on the part of Prudential in the hope of demonstrating a lack of good faith on the part of Prudential's board of directors in the application of the dividend formula. After receiving an offer of proof, the district court refused to admit the evidence regarding the reasonableness of the retention charges computed in compliance with the dividend formula, ruling that Miller had agreed to submit the determination of the retention charges to the discretion of Prudential's board of directors.

Miller presents the following issues for consideration on appeal: (1) whether the insurance contract is ambiguous; (2) whether the evidence reveals a reasonable misunderstanding as to the terms of the contract, or a mutual mistake, on the part of Miller and Prudential and thus prevented a "meeting of the minds" which is necessary for a binding contract; (3) whether the trial court erred in refusing to consider Prudential's good faith and fair dealing under the Policy; and (4) whether Prudential charged Miller interest in violation of the express terms of the insurance contract.

## II

### Ambiguity

The "Premium Computation" clause in the Policy provides that Miller is liable to Prudential for a "premium" as "determined from the premium rates then in effect and the employees insured...." Miller sets forth two defenses in an attempt to circumvent the clear and unambiguous terms of the insurance contract. Miller initially argues that the second sentence in the "Premium Computation" clause in the Policy, signed in April, 1978, that took retroactive

---

industry today, we will not address the appropriateness of this definition. See Rosenbloom, *The Handbook of Employee Benefits* at 701 (1984) (defining flexible funding as premium payments during the year consisting of actual claims paid plus a monthly assessment for the cost of administering the policy).

effect in 1977, is ambiguous and thus the court erred in determining Miller's liability to Prudential based upon the express terms of the Policy. Miller argues that the court should have attempted to determine the intent of the parties as to the expected amount due under the contract when the negotiations culminated in the summer of 1977 and requests that we remand this case to the district court for further findings as to the parties' intent.

The Policy expressly recites that the law of the State of Wisconsin governs the interpretation of its terms. Wisconsin law provides that if the contract language is unambiguous the terms in the written contract "may not be varied or contradicted by evidence of any prior written or oral agreement ..." *In re Spring Valley Meats, Inc.*, 94 Wis.2d 600, 607, 288 N.W.2d 852, 855 (1980) (*quoting Federal Deposit Insurance Corp. v. First Mortgage Investors*, 76 Wis.2d 151, 250 N.W.2d 362 (1977)). *See also Kramer v. Alpine Valley Resort, Inc.*, 108 Wis.2d 417, 426, 321 N.W.2d 293, 297 (1982). The rules of contract construction governing when contract language is considered ambiguous apply equally well to the interpretation of insurance contracts:

"The construction of words and phrases in insurance policies is generally a matter of law and is controlled by the same rules of construction as are applied to contracts generally.... The objective in interpreting and construing a contract is to ascertain and carry out the true intention of the parties.... The words of an insurance contract are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean but what a reasonable person in the position of the insured would have understood the words to mean. ... The reasonable expectations of coverage of the insured should be furthered by the interpretation given.... *Language in an insurance contract is to be given the common and ordinary meaning it would have in the mind of a lay person.... Words or phrases in a contract are ambiguous when they are fairly susceptible ·to*

*more than one construction....* Whether ambiguity exists in a contract is a question of law.... *Where no ambiguity exists in the terms of the policy, we will not engage in construction, but will merely apply the policy terms."* *Kremers—Urban Co. v. American Employers Ins.*, 119 Wis.2d 722, 735–36, 351 N.W.2d 156, 163 (1984) (citations omitted) (emphasis added). As the Wisconsin Supreme Court stated in *Kremers—Urban Co.*, the language of a contract is considered ambiguous only if the terms of the contract are fairly susceptible to more than one construction. *Id.; see also Bradley Bank v. Hartford Acc. & Indemnity*, 737 F.2d 657, 660 (7th Cir.1984).

The first sentence in the "Premium Computation" section of the Policy provides that Miller is liable for the "premium due," which is determined by the "premium rates then in effect" multiplied by "the employees insured." The Policy further states that a dividend may be payable to Miller and "will be determined annually by Prudential's Board of Directors...." Finally, the Policy recites that the terms contained within the Policy "constitute the entire contract." Miller does not contend that the terms contained in this portion of the Premium Computation sections of the Policy are unclear or ambiguous, but argues, for the first time an issue not raised at the trial level, that the language in the "Premium Computation" section of the Policy reciting, *"Premiums may be computed by any other method mutually agreeable to the policyholder and Prudential which produces approximately the same amount"* renders the contract ambiguous. Specifically, Miller argues that pursuant to its understanding of the contract this sentence of the contract provided for the "flexible funding" method of calculating the total premium due, and that it would be responsible, at least as far it understood from its negotiations with Prudential during 1977, for only those claims paid by Prudential plus Prudential's monthly retention charge. Miller, as just noted, raises for the first time an issue not addressed to

the district court—specifically, that the second sentence in the "Premium Computation" section of the Policy rendered the contract ambiguous—and it is "axiomatic that arguments not raised below are waived on appeal." *Libertyville Datsun Sales, Inc. v. Nissan Motor Corporation,* 776 F.2d 735, 737 (7th Cir.1985); *Erff v. MarkHon Indus., Inc.,* 781 F.2d 613, 618 (7th Cir.1986). Even were we to reach the merits of Miller's argument, which we refuse to address as we deem this argument waived since Miller failed to raise it before the trial court, we would reject its argument. Miller argues that this second sentence providing that the parties may agree to an alternative method of calculating the premium due under the Policy renders the Policy ambiguous as it provides that the parties may agree to an alternative for computing the premium payment, and Miller believed that its premiums were being calculated according to the alternate method. However, in *Wilke v. Eau Claire First Federal Savings & Loan Association,* 108 Wis.2d 650, 654, 323 N.W.2d 179, 181 (Ct.App.1982) the Wisconsin appellate court noted that "merely because its [contract's] language generally [sic] [is] enough to encompass more than one option" does not render a contract ambiguous. Here, the second sentence in the Premium Computation Section of the Policy merely provides for a second method of computing the premium, and thus this option does not itself render the Policy ambiguous. Further, this sentence clearly provides that the alternative premium computation methods selected by the parties must produce "approximately" the "same" amount of premium as computed by the formula contained in the first sentence of the "Premium Computation" section of the Policy. *See Kremers-Urban Co.,* 119 Wis.2d at 735–36, 351 N.W.2d at 163 (noting that "[l]anguage in an insurance contract is to be given the common and ordinary meaning....") Miller's position throughout these proceedings, however, has been that it has not been legally obligated to pay the full premi-

um due under the contract, since it believed that, pursuant to the flexible funding method of payment, it reimbursed Prudential for the entire premium due under the contract when it paid Prudential the monthly amounts due, consisting of the actual claims plus retention costs. Thus, Miller's position that it was not obligated to pay the full premium computed pursuant to the provisions in the first sentence of the Premium Computation Clause contradicts its argument that the second sentence renders the contract ambiguous since the second sentence provides that the parties may agree to some other method of payment that provides for the "same" total amount as computed pursuant to the provisions in first sentence of the Premium Computation Clause.

## Mutual Mistake

Miller next argues that the parties to the contract, Prudential and Miller, each misunderstood the meaning that the other attached to the key term "flexible funding," the basis of the contract negotiations, and thus a "mutual mistake" existed in the formation of the contract under Wisconsin law. Specifically, Miller asserts that Prudential interpreted this term as describing a billing mechanism whereby Miller would submit payments to Prudential, calculated by totaling the claims paid plus Prudential's retention charges, and that at year-end Miller would pay the difference between the premium due under the contract and the amount (claims plus estimated retention) remitted for the premium during the year. Miller, on the other hand, states that when it entered into the contract it interpreted "flexible funding" (for its own benefit) to mean a method to compute its *total* premium due under the contract; thus Miller asserts that pursuant to its understanding of flexible funding the remittance to Prudential for the claims actually paid plus Prudential's monthly retention charge constituted the entire premium due under the contract.[7]

---

**7.** As noted previously, Young and Naughton, Miller's employees, testified that they under-

stood flexible funding to mean that Miller would only be liable for claims plus retention

Wisconsin recognizes the common law defense of mutual mistake as a defense to an asserted contractual obligation. *See, e.g., In re Spring Valley Meats, Inc.,* 94 Wis.2d at 606, 288 N.W.2d at 855 ("when the parties to a contract put their agreement in writing and intend their writing to be the final expression of their agreement, the terms of the writing may not be varied ... in the *absence of* fraud, duress or *mutual mistake*"). Since Miller does not allege that this agreement with Prudential was procured through either fraud or duress, we need not address these issues. As to the mutual mistake argument, Miller asks us to venture outside the terms of the Policy signed in 1978, that took retroactive effect in 1977, to the negotiations between the parties in 1977. However, we have previously construed the policy terms and held that the contract signed by the parties is unambiguous, clear and integrated (i.e. contains a clause stating that the contract contains all of the terms of the agreements); thus the Policy controls the assessment of Miller's liability to Prudential. The court, although not obligated to do so, admitted parol evidence as to the intent of the parties in negotiating this contract (at least as to Miller's intent). A review of this evidence reveals that there is no merit to Miller's position that there was a mutual mistake in the interpretation of the term "flexible funding" as Miller received exactly what it bargained for—premium payments that would not include a charge for margins. As previously noted, in 1976 Miller paid insurance premiums determined pursuant to the rates charged for a conventionally funded insurance policy that contained a charge to cover margins. In order to avoid paying the margin charge, and thus increase its cash flow, Miller sought insurance coverage that would allow Miller to pay only the retentional charges plus claims paid, without having to pay the charge for margins. Thus, Miller's bid specifications stated that it would pay the "retentional charges excess mortality and claims paid for the month up to the aggregate limit of what the premium charges would have been." The record reveals that this is the specific type of insurance agreement (premium charges covering only claims plus retention) that Prudential provided. Prudential calculated the amounts due under the contract when it determined the premium due (the number of employees times the insurance rate per employee) and subtracted from this amount the dividend declared by the board of directors. The dividend returned to the policyholders is determined by subtracting the claims paid (plus its actual retention charges incurred during the year) from the total premium due under the Policy. *See* footnote 4, *supra.* Thus, the policyholder under this type of policy reimburses the insurance carrier only for the claims paid by the carrier plus its retention charges. The net effect is that Miller received what it bargained for—Miller was required to reimburse Prudential only for those claims paid by Prudential plus Prudential's retention charge, and it achieved its desired cash flow result since its premium payments did not include the assessment for the "margins" [8] it was previously obligated to pay under the conventionally funded insurance plan. Miller asserts, however, that pursuant to its understanding of the flexible funding formula, it was obligated to reimburse Prudential only for those retention charges listed in the billing worksheets its employees completed and filed with Prudential on a monthly basis. These billing worksheets, however, clearly described the retention charge as "estimated retention," and thus Miller cannot argue that it was not aware that the retention costs were not a fixed amount.[9] Further, Prudential's

---

and that the premium calculated pursuant to a conventionally funded policy represented a "cap" or maximum liability as to the premiums due under the contract.

**8.** *See supra* note 2 for an explanation of what constitutes a "margin."

**9.** The worksheet listed the amounts due for each month, as follows:

proposal to Miller, submitted in response to Miller's specifications requesting a flexible funding plan, clearly states that these retention charges are only estimates:

> "Depending upon the growth (or decline) and number of insureds and changes in composition of the group, actual retention at year-end could differ substantially with that projected by the carrier at the beginning of the year."

At trial, a partner at Hewitt, the consultant hired by Miller to review the bids, and Miller's employees charged with the supervision of the company's benefit program admitted that they merely skimmed the Prudential proposal and did not read, much less assimilate, this cautionary language. (Tr. 348, 428–29). Pursuant to Wisconsin law a party's negligence in reading documents supporting the contract does not excuse that party from performing its obligations under the contract. *See Knight & Bostwick v. Moore,* 203 Wis. 540, 542, 234 N.W. 902 (1931) (" 'A person cannot sign a paper in ignorance of its contents and thereafter excuse such ignorance by the mere plea ... that he is neglectful in such circumstances.' "); *Ritchie v. Clappier,* 109 Wis.2d 399, 404–05, 326 N.W.2d 131, 134 (Ct.App.1982). A court, especially under the facts of this case, will not excuse a party's negligence in failing to read the contract where a corporation, such as Miller, was aided by a professional insurance consulting agency in reviewing the contract and in negotiating the type of coverage that Miller was to receive under the policy.[10]

| | | |
|---|---|---|
| 4. | Claims: | $82,500 |
| 5. | Prior Months Carryover | — |
| 6. | *Estimated* Retention | 3,900 |
| 7. | Estimated Monthly Cost | $86,400 |

10. Miller cites a line of cases setting forth the fundamental contract law principle that a contract does not exist when two parties to an agreement attach "materially different meanings [to the terms of the contract] and neither one knew or *had reason to know* the meaning of the other,...." Restatement (Second) of Contracts § 20(1)(a) (1979) (emphasis added); A. Corbin, Contracts § 104 (1963); *Oswald v. Al-*

After reviewing the Policy and the evidence presented at trial, we hold that the terms of the written Policy, approved by all parties to the contract negotiations, are clear and unambiguous and provided that Miller was obligated to pay Prudential the premium due (as determined by the rate that is paid for coverage times the number of employees) less the dividend declared by Prudential's board of directors. We further hold that there was no mutual mistake in the formation of the contract since the record reveals that both Miller and Prudential received the expected benefits from the contract they openly negotiated and bargain for. Thus, the extent of Miller's liability to Prudential is determined by the terms of the insurance Policy.

### Evidence as to Retention Charges

Miller next asserts (although it is not entirely clear in its brief) that the district court failed to consider evidence as to the lack of Prudential's "good faith" and "fair dealing" in applying its dividend formula. Specifically, it argues that the court should have considered evidence as to reasonableness of the retention charges assessed by Prudential to Miller in calculating the dividend. *See supra* note 4 for an example of the dividend formula.

The record reveals that the district court did allow Miller to cross examine Prudential's witness, Mr. Kaminsky, the Prudential employee who computed the dividend due Miller from Prudential. Thus, Miller was not precluded from exploring the particulars as to how the dividend was computed. The district court granted Prudential's

*len,* 417 F.2d 43 (2d Cir.1969); *Raffles v. Wichelhaus,* 2 H & C 906, 159 Eng.Rep. 375 (Ex.1844). It is Miller's conduct exclusively in negligently failing to read and assimilate Prudential's proposal and Policy, subsequently signed by both parties, that distinguishes this case from those cited by Miller. Had Miller been careful and read and assimilated the Prudential insurance proposal and Policy thoroughly, Miller would have known that its understanding of the term "flexible funding" was significantly different from Prudential's interpretation of the method of calculating the premium or if not, it should have been put on notice and thus could have demanded an explanation and/or interpretation

motion *in limine* requesting that evidence be excluded as to the reasonableness of Prudential's retention charges.[11] The court excluded this evidence as it believed the reasonableness of these charges was not at issue as Miller had previously agreed to the terms of the Policy that provided in clear and unambiguous terms that the determination of a dividend, if any, was committed to the discretion of Prudential's board of directors.[12]

■ We may reverse the district court's decision excluding evidence only if we determine that the district court abused its discretion. *See e.g. Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d 1109, 1115 (7th Cir.1983). Here, the Policy provided that the dividend "would be determined annually by Prudential's Board of Directors" and thus the Policy committed the determination as to the amount of the dividend (which is based in part upon the calculation of retention) to the discretion of Prudential's board; Miller agreed to the terms of this contract when it signed the Policy. We realize the scope of discretion committed to the board to determine the amount of the dividend, however, is not limitless, and is defined within the terms of this contract. It is assumed under Wisconsin law that both parties to the contract acted in good faith in negotiating the contract and thus a duty of good faith is implied in every contract. *See Amoco Oil Co. v. Cardinal Oil Co., Inc.,* 535 F.Supp.

661, 666 (E.D.Wis.1982) (*citing Estate of Chayka,* 47 Wis.2d 102, 107–08, 176 N.W.2d 561, 564 (1970)). Good faith, under Wisconsin law, is defined as "honesty in fact," *see Estate of Chayka,* 47 Wis.2d at 107 n. 7, 176 N.W.2d at 564, and thus Miller bears the burden of demonstrating that Prudential acted in bad faith in determining the amount of the dividend.[13]

■ In this case, Miller was allowed to cross-examine Kaminsky as to the application of the dividend formula. Kaminsky's testimony reveals that he followed Prudential's dividend formula in subtracting retention plus claims paid by Miller from the contract premium to compute the dividend to Miller. It is clear that there is little discretion involved in following the dividend formula, and Miller does not take issue with the method used by Prudential to compute the dividend but argues that the amount of retention costs charged pursuant to that formula is unreasonable and thus demonstrates bad faith. The retention cost was clearly related to this calculation of the dividend and the policy committed the calculation of the dividend to the discretion of the board of directors. Even though Miller may believe that the actual retention figures charged by Prudential are excessive, Miller, had it bothered to read the Prudential proposal and not just "skim" it, would have known, and in fact it was explicitly advised,[14] that retention

---

of the same before entering into and approving the contract.

**11.** Pursuant to an offer of proof, Mr. Leahy, Miller's expert witness, would have testified that Miller would have owed only approximately $590,000 rather than the $850,000 that Prudential was demanding as payments due under the contract. He calculated this $590,000 figure by estimating the amount of retention that should have been charged by Prudential had Prudential's percentage of retention charges contained within the original proposal remained the same over the life of the contract.

**12.** The "Dividends" section of the Policy provides: "The portion, if any, of the divisible surplus of Prudential allocable to the Group Policy at each policy anniversary will be determined annually by Prudential's Board of Directors and

will be credited to the Group Policy as a dividend...."

**13.** The custom in the mutual fund insurance industry is to commit the declaration of the dividend to the discretion of the insurance company's board of directors, and its determination cannot be challenged absent a showing of bad faith. *See Triscaro v. Union Labor Life Ins. Co.,* 355 F.2d 1 (6th Cir.1966); *Couch on Insurance 2d* § 34.121 (1961).

**14.** In 1980, when Miller inquired of Prudential about the year end payments, Kaminsky explained to Miller that the amount of the funds they were submitting were inadequate to cover the retention charges, but in spite of this information Miller refused to increase its monthly payments to cover the increased retention charges.

costs were estimated and might very well exceed the amounts listed in the proposal because of increases in Prudential's administrative expenses due to an increasing number of covered employees, and processing of claims etc. The evidence clearly discloses that the figures in the Prudential proposal were merely estimates and were not etched in marble as the Prudential proposal clearly stated that the "actual retention at year-end could differ substantially with that projected by the carrier at the beginning of the year." Thus Miller's argument that the retention charges were "too high" is unpersuasive under the facts of this case and fails to demonstrate that Prudential acted in bad faith in calculating the dividend, especially when Miller had been advised that the payments were inadequate and had knowledge of the fact that the retention figures were only estimates and could change substantially. We hold that the district court did not abuse its discretion in granting defendant's motion *"in limine"* excluding evidence as to what Miller believed to be the proper amount for the retention charges.

### Interest Grace Period

Miller finally contends that if the terms of the Policy control the determination of its liability, Prudential assessed $66,871 of interest, contrary to a clause in Policy that states: "A grace period of thirty-one days without interest charged, is allowed for the payment of each premium." According to the terms of the Policy, Prudential will not charge a policyholder interest (i.e. debit the policyholder's account) for the first 31 days after the premium payment is due. The language of the policy provides that if the premium is not paid after 31 days, Prudential will begin to charge the policyholder interest on the late premium payment. Correspondingly, Prudential will credit interest to the policyholder's account if the policyholder makes his monthly premium payment in a timely fashion. Kaminsky, Prudential's employee in charge of the dividend calculation, offered the following explanation at trial as to the operation of Prudential's interest debits and credits. If a $1,000 premium payment on the annual $12,000 premium charge is due on March 1, and the policyholder pays this premium timely on March 1, the policyholder receives an interest credit from Prudential on this $1,000 for the use of the policyholder's money for that month of March and the remainder of the year. If the policyholder instead makes its monthly premium payment, due on March 1, on April 28, the payment is considered 28 days late and thus the policyholder is assessed an interest charge or debit for those twenty-eight days after March 31 that it did not submit the premium payment. Miller contends that this interest credit is in reality an interest charge in disguise since the total amount owed by Miller would have been less (the difference, according to Miller, representing an interest charge) if it had received an interest credit for the thirty-one day grace period. Miller did not receive an interest credit for the monthly 31-day grace period since it did not pay its full monthly premium within the 31-day grace period as it was paying its premium to Prudential pursuant to the flexible funding billing mechanism.

██ Miller's argument fails to persuade us that Prudential was in effect charging interest in violation of the thirty-one day interest grace period allowed under the terms of the Policy. Granted, the total amount charged Miller's account would have been less had Miller paid the full monthly premium on a timely basis (the first day of every month) since Miller would have received an interest credit from Prudential for the remainder of the year for the use of its money. However, the fact that Prudential failed to credit Miller's account with interest during that period in which Miller was not making a full premium payment, thus causing Miller's total payment at year-end to increase, does not establish that Prudential in effect charged Miller interest against its (Miller's) account. At trial, Kaminsky explained that the interest credit is given to those policyholders who allow Prudential to hold the policyholder's cash during the year, and, since

Miller was not making a full premium payment on a timely basis throughout the year, it was not entitled to receive an interest credit for those unpaid premiums.[15] Thus we hold that Prudential did not assess interest against Miller's account in violation of the 31-day interest grace period contained in the Policy.

The decision of the district court is AFFIRMED and costs are awarded to Prudential.

---

**15.** Further, a company in Prudential's position can certainly offer inducements, such as an interest credit, in order to encourage policyholders to make prompt premium payments on or before the date their premium payments are due.