BANK OF SUN PRAIRIE, Plaintiff-Appellant-Cross Respondent, †

v.

Leah J. ESSER, Defendant-Respondent-Cross Appellant.

Court of Appeals

*No. 88–0460. Submitted on briefs March 8, 1989.—Decided May 18, 1989.*

(Also reported in 442 N.W.2d 560.)

† Petition to review granted.

For the plaintiff-appellant and cross-respondent the cause was submitted on the briefs of *Francis J. Eustice* and *Gregory J. Fumelle,* and *Brill & Eustice, S.C.,* of Sun Prairie.

For the defendant-respondent and cross appellant the cause was submitted on the briefs of *Carlton Roffa,* of Brookfield.

Before Gartzke, P.J., Dykman and Eich, JJ.

EICH, J. The Bank of Sun Prairie sued Leah Esser on her guaranty of a loan taken out by her brother, Keith Johnson. Esser counterclaimed, charging that the bank had misrepresented the terms of the guaranty to her. The trial court denied the bank's motion for summary judgment on its claim, although it later directed a verdict in the bank's favor at the close of the trial. The case went to the jury on Esser's misrepresentation claim, and the jury found in her favor. The bank appeals from the judgment confirming the jury's verdict, and Esser cross-appeals from an order granting the bank's motion in limine prohibiting her from placing certain facts before the jury and also from the court's refusal to include a punitive damage question in the special verdict.

The parties raise a variety of overlapping issues in their briefs. We believe the dispositive issues are: (1) whether the trial court erred in denying the bank's motion for summary judgment on Esser's guaranty; (2) whether the verdict is supported by credible evidence; and (3) whether the court erred in refusing to submit Esser's claim for punitive damages to the jury.[1] We

[1]Esser's argument that the trial court erred in granting the bank's motion in limine is undeveloped. In essence, Esser claims that she should have been allowed to put before the jury information that Keith Johnson had been discharged in bankruptcy, and that one of his debts the bank claimed was covered by her guaranty was one listed in the bankruptcy petition. The trial court ruled that use of the word "bankruptcy" could carry prejudicial overtones and restricted the parties to instead use the word "uncollectible" in references to the debt.

The trial court made a lengthy ruling on the motion, and Esser does not indicate how the court abused its discretion in deciding this evidentiary issue. We do not consider arguments raised, but never really argued, by the parties. *Reiman Associates*

reverse the punitive damage ruling and remand for a new trial on this limited issue. In all other respects, we affirm the judgment.

The underlying facts are undisputed. Johnson wanted to borrow approximately $4,800 from the bank to purchase a truck. He was advised that the loan would be made only if Esser co-signed the note because, among other things, Johnson had gone through bankruptcy proceedings several weeks earlier, and one of the debts involved in those proceedings was a $27,500 "business note" he had given to the bank in connection with another transaction. Esser agreed to co-sign the note and accompanied Johnson to the bank to sign the truck loan papers.

Several documents were involved in the transaction. Esser co-signed Johnson's installment note and a security agreement, and also a "Continuing Guaranty (Unlimited)." She was given another form prepared by the bank entitled "Explanation of Personal Obligation," which she signed to acknowledge receipt. The document at issue in the case is the guaranty, which contained the following provisions:

> [f]or value received, and to induce The Bank of Sun Prairie . . . to extend credit to Keith M. Johnson, [Esser] . . . *guarantee[s] payment . . . to Bank when due . . . all loans . . . notes and all other debts . . . arising out of credit previously granted,* credit contemporaneously granted or . . . granted in the future by Bank to [Johnson] . . .. To the extent not prohibited by law, this Guaranty is valid and enforceable against the undersigned even though any Obligation is invalid and unenforceable against [Johnson]. [Emphasis added.]

*v. R/A Advertising,* 102 Wis. 2d 305, 306 n. 1, 306 N.W.2d 292, 294 (Ct. App. 1981).

Johnson eventually defaulted on the truck loan and the bank sued Esser on the guaranty, seeking to recover not only on the $4,800 truck loan, but also Johnson's earlier $27,500 business note. Answering the complaint, Esser claimed that the earlier debt was extinguished in Johnson's bankruptcy. The bank moved for summary judgment contending that, while the bankruptcy proceedings may have discharged Johnson's liability on the business note, the debt still existed and was subject to Esser's guaranty. The trial court, without elaboration or further explanation, denied the motion on grounds that "there are questions of fact involved in this matter . . .." Esser then filed a counterclaim alleging that the bank had fraudulently induced her to sign a guaranty covering debts in addition to those she thought she was guaranteeing.

A different judge was assigned to preside at the trial. At the close of the evidence, the court ruled that Johnson's bankruptcy did not bar recovery on the guaranty and granted the bank's motion for a directed verdict on Esser's liability for the two debts. The case went to the jury solely on Esser's counterclaim for misrepresentation. The jury found in Esser's favor and the appeal and cross-appeal followed. Other facts will be referred to in the body of the opinion.

## I. SUMMARY JUDGMENT

The bank argues first that it was error for the trial court to deny its motion for summary judgment without stating precisely what material facts were in dispute. As evidence of the error, the bank points to the subsequent directed verdict on the same issues it raised in the earlier summary judgment motion.

Our review of summary judgments is *de novo;* we apply the same criteria as the trial court. *Messner v. Briggs & Stratton Corp.,* 120 Wis. 2d 127, 131, 353 N.W.2d 363, 365 (Ct. App. 1984). Our own review of the affidavits and counteraffidavits submitted in connection with the bank's motion satisfies us that no material facts were in dispute, and that the motion should have been granted.

In support of its motion, the bank filed the affidavit of its vice president, Duane Manley, who obtained Esser's signature on the guaranty. The affidavit describes Johnson's default on his earlier $27,500 business note to the bank, Esser's execution of the guaranty covering all Johnson's prior debts, and Esser's refusal to honor the guaranty. In opposition, Esser filed her own affidavit, excerpts from an earlier deposition, and an affidavit from Johnson. However, none of Esser's proofs disputed the fact of Johnson's nonpayment of the prior debt, the terms of Esser's guaranty and her own refusal to pay. They went only to Johnson's bankruptcy proceedings.

At the time of the summary judgment motion, there were no claims of misrepresentation or fraud in the case. Esser's answer contained only a general denial and the affirmative defense that she could not be liable for Johnson's earlier debt because it was a listed obligation in the bankruptcy proceedings. She did not file her counterclaim until later.

As a result, the only facts material to the bank's motion for summary judgment on Esser's liability on the guaranty were the guaranty itself and Johnson's default on the prior debt. And Esser's proofs in opposition to the motion did not dispute or contradict any of these facts.

18

As a result, the trial court's unexplained ruling that summary judgment was inappropriate because of the existence of disputed material facts was error. The motion presented only a legal question which, given the fact that the bank's pleadings and motion papers presented a *prima facie* case for judgment, should have been ruled upon by the trial court. Because we independently review grants—or denials—of summary judgment, we may consider that legal issue on appeal.

While the parties' trial briefs on the summary judgment motion are not part of the record, the transcript of counsel's argument at the hearing on the motion establishes that the primary issue was whether the bankruptcy judgment discharging Johnson from liability on the earlier business note also relieved Esser of liability for that note under the terms of her guaranty. The issue is not addressed by either party on appeal. As a result, we consider it conceded that the bankruptcy had no effect on Esser's liability. *See Charolais Breeding Ranches v. FPC Securities,* 90 Wis. 2d 97, 109, 279 N.W.2d 493, 499 (Ct. App. 1979).

Our conclusion that the trial court erred in not granting summary judgment to the bank on the guaranty does not, as the bank would have it, void all other proceedings in the trial court. Indeed, it does not even require reversal of any portion of the judgment, for the trial court properly directed a verdict on the issue at trial.[2]

---

[2]As indicated, the trial court, after denying the motion for summary judgment, eventually granted the bank's motion for directed verdict on its complaint against Esser. She claims that this was error because the evidence of Manley's misrepresentations—which the jury believed—indicates that there was no "meeting of the minds" on the "real" terms of the guaranty. We see no need to address the issue, however. The parties stipulated

We have previously noted that at the time the motion for summary judgment was decided, Esser had yet to file her counterclaim for misrepresentation. The bank contends that because of this, the entire action should have terminated with the granting of its motion for summary judgment and asks that we void all subsequent proceedings, including the trial on Esser's counterclaim. We decline to do so. The misrepresentation counterclaim was properly pled and tried to a jury. Both parties have appealed from that verdict as well as from certain rulings of the trial court, and both have briefed their arguments for and against affirmance of the judgment. These factors, together with the fact that Esser could have advanced her claims in an independent action against the bank, convince us that we should decide the appeal and cross-appeal, rather than void all proceedings following the summary judgment motion and send everyone back to square one for possible retrial of the same issues.

prior to trial that, should the jury find for Esser on her counterclaim for misrepresentation, her "damages [would] be limited to the amount of money awarded to the [bank], upon its complaint, so that if the jury's verdict [is] favorable to [Esser], the same would vitiate and make the [bank's] judgment upon its complaint null and void," except for an agreed-to judgment for attorney fees. The jury, of course, found for Esser and we have affirmed its findings.

Thus, any way one looks at the case, it is a "wash." Should Esser prevail on her claim that the guaranty is unenforceable because its terms were never agreed to, she could not have been damaged by whatever representations Manley may have made that led her to sign it. It would serve no purpose to pursue the argument further.

## II. THE JURY VERDICT

The jury returned a verdict finding that Manley had induced Esser to sign the guaranty by misrepresenting to her that it covered only the truck loan. The bank claims not only that there is no evidence in the record to support that verdict, but that the trial court should have directed a verdict in its behalf on this issue. We are satisfied that there is evidence in the record to support the verdict.

Our review of jury verdicts is strictly confined to whether the record contains any credible evidence that under any reasonable view supports the verdict. *Ford Motor Co. v. Lyons,* 137 Wis. 2d 397, 442, 405 N.W.2d 354, 372 (Ct. App. 1987). And the scope of our review is even more limited where, as here, the verdict has the trial court's approval. *Fehring v. Republic Ins. Co.,* 118 Wis. 2d 299, 305, 347 N.W.2d 595, 598 (1984). We search the record for evidence supporting the jury's verdict, not for evidence that would sustain a verdict the jury could have reached but did not. *Id.* at 306, 347 N.W.2d at 598. In addition, the task of assessing the credibility of the witnesses and the weight to be accorded to their testimony is one left solely to the jury, and where more than one reasonable inference may be drawn from the evidence, we must accept the inference drawn by the jury. *Id.* at 305-06, 347 N.W.2d at 598.

Here, the jury found: (1) that Manley misrepresented to Esser that the guaranty she signed related only to Johnson's truck loan; (2) that when he made the representation, Manley either knew it was untrue or made it recklessly, not caring whether it was true or not; (3) that the representation was made with the intent to induce Esser to act upon it; and (4) that Esser believed

the representation and justifiably relied on it to her pecuniary damage.

The bank, while challenging the first finding, concedes in its brief that there was "conflicting testimony" on the point. As we have said, any conflicts in the testimony are to be resolved by the jury, not by this court.

The evidence of what occurred when Esser signed the guaranty and other loan papers is discussed at length in section III of this opinion. Suffice it to say that Manley's testimony was that he explained the ramifications of the transaction in detail, specifically informing Esser that she was guaranteeing not only the "new" $4,700 truck loan, but also Johnson's prior $27,500 debt. Esser's and Johnson's testimony was to the contrary. Johnson stated that there was little, if any, discussion and that Manley simply pushed a group of papers over to Esser, telling her where to sign them. Esser "absolutely" denied that Manley ever mentioned the $27,500 debt and testified that he specifically told her she was signing for only the "new" truck loan. The jury was free to adopt either version of the facts, and Esser's testimony provides adequate support for the jury's answer to the first special verdict question.

The questions inquiring whether Manley knowingly or recklessly misrepresented the documents, and whether he did so to deceive Esser and induce her to sign the documents, relate to his state of mind—his intent. Such questions naturally require the jury to draw inferences from the testimony, and as long as the inferences drawn are reasonable, we will not disturb the ultimate determination. *In Matter of Estate of Dejmal,* 95 Wis. 2d 141, 151–52, 289 N.W.2d 813, 818 (1980). Questions of "intent" and "knowledge" are for the jury to ascertain "based on the totality of the circumstances, including

what [Manley] said or did . . . and any objective evidence which is available." *State v. Lossman,* 118 Wis. 2d 526, 542–43, 348 N.W.2d 159, 167 (1984).

Manley acknowledged that he knew that Johnson was "uncollectible" and that Esser "was good for [the $27,500 debt]" because "she had owned a lot of real estate in Cottage Grove." Considered along with the other evidence of the bank's past dealings with Johnson and Esser, the jury could reasonably infer from this testimony that, given Manley's motivation to recoup the bank's loss on Johnson's business note, he may have been willing to go to some lengths to induce Esser to cover the debt. While this is not the *only* inference that can be drawn, it is a reasonable one and, under the standards governing our review of jury verdicts, we are bound to accept it.

Finally, the bank argues that because Esser acknowledged that she did not read the guaranty in its entirety, she must be held negligent as a matter of law and that such negligence, also as a matter of law, absolutely bars any claim of justifiable reliance. In the alternative, the bank contends that the jury could not properly find that Esser "justifiably relied" upon Manley's misrepresentation on the evidence before it.

The bank's argument is based almost entirely on *Ritchie v. Clappier,* 109 Wis. 2d 399, 404, 326 N.W.2d 131, 134 (Ct. App. 1982), where we considered the issue of "justifiable" reliance and stated that "[g]enerally, a person is negligent if he or she signs a contract without ascertaining its contents and is not prevented from doing so, even if induced to sign by fraudulent misrepresentations." *Id.* at 404–05, 326 N.W.2d at 134. The rule is not absolute, however, for we also noted in *Ritchie* that:

The fact that a false representation is made in respect to the paper is not necessarily sufficient to excuse such person for affixing his [or her] signature [to it] in ignorance of its contents, unless under all the circumstances, in view of [the] duty to give reasonable attention to the protection of his [or her] own interests, the false representation was still reasonably calculated to and did induce him [or her] not to make the investigation which he [or she] otherwise would have made. *Id.* at 405, 326 N.W.2d at 134, quoting *Standard Mfg. Co. v. Slot,* 121 Wis. 14, 23-24, 98 N.W. 923, 926 (1904).

The "intelligence and experience of the misled individual" and "the relationship between the parties" are important considerations in determining whether a person's negligence in failing to read a document before signing it may be excused. *Ritchie,* 109 Wis. 2d at 405-06, 326 N.W.2d at 134, quoting *Williams v. Rank & Son Buick, Inc.,* 44 Wis. 2d 239, 246, 170 N.W.2d 807, 810-11 (1969). In *Ritchie,* for example, the party seeking protection was a licensed real estate broker confronted with a document entitled "QUIT CLAIM DEED." *Ritchie,* 109 Wis. 2d at 406, 326 N.W.2d at 134-35. Based upon the broker's experience and knowledge, as well as his admission that he "did not trust defendants," we were unwilling to absolve him from his responsibility to read the document he signed. We concluded that, given those facts, he could not "justifiably rely" upon the defendants' misrepresentation. *Id.* In this case, Esser had no such special experience or knowledge.

Finally, *Ritchie* was a trial to the court on undisputed facts. Because the facts were undisputed, we treated the question whether the broker was justified in relying on the other party's representations as one of law. *Id.,* 109 Wis. 2d at 406, 326 N.W.2d at 134. Here,

24

however, the facts were in sharp dispute, and the reasonableness of Esser's reliance on Manley's representations (a mixed question of fact and law) was properly left to the jury.

We conclude, therefore, that *Ritchie* does not automatically bar a person who fails to read all of the terms of a note or similar paper from claiming that he or she was induced to sign the document by reason of another's fraudulent misrepresentations. We believe that the quotation from *Standard Mfg. Co. v. Slot,* which we have set forth above, and which was also quoted in *Ritchie,* states the proper rule. *See also Farmer City State Bank v. Guingrich,* 487 N.E.2d 758, 765 (Ill. App. Ct. 1985) ("action or statements of the person making a misrepresentation may inhibit the other person's inquiries or lull him [or her] into a false sense of security, thereby blocking investigation into the truth of the representation").[3]

We also believe the jury could conclude on this record that Esser's reliance was reasonable. Esser testified that she trusted Manley, that she had co-signed

---

[3]The bank relies upon *Prudential Ins. Co. v. Miller Brewing Co.,* 789 F.2d 1269 (7th Cir. 1986), to support its position that failure to read a document absolutely bars a party from seeking refuge in the "justifiable reliance" doctrine. However, in *Prudential,* the court, in refusing to excuse Miller from performing its obligations under an insurance contract with Prudential on grounds of mutual mistake, stated: "A court . . . will not excuse a party's negligence in failing to read the contract where a corporation, such as Miller, was aided by a professional insurance consulting agency in reviewing the contract and in negotiating the type of coverage that Miller was to receive . . .." *Id.* at 1278 (footnote omitted). *Prudential* is readily distinguishable from the facts of the case before us, for here Esser was unskilled in business transactions and was acting wholly without independent professional advice.

other loans for Johnson, that she was not familiar with banks' security practices, that she knew Johnson had been discharged in bankruptcy, and that Manley repeatedly told her the documents applied to the "new loan." The bank has not persuaded us that the jury's verdict lacks support in the evidence.

## III. PUNITIVE DAMAGES

Esser requested that the trial court instruct the jury on punitive damages and include a punitive damages question in the special verdict. The court refused.

Punitive damages are appropriate in cases where the plaintiff can prove by clear and convincing evidence that the conduct complained of was "willful or wanton, in a reckless disregard of [another's] rights or interests." *Brown v. Maxey,* 124 Wis. 2d 426, 433, 369 N.W.2d 677, 681 (1985). "Outrageous" is another word sometimes used to describe the type of conduct that will subject a defendant to punitive damages. *Id.* The trial court decides in the first instance "whether the evidence establishes a proper case for the allowance of punitive damages and whether the issue should be submitted to the jury." *Maskrey v. Volkswagenwerk Aktiengesellschaft,* 125 Wis. 2d 145, 161, 370 N.W.2d 815, 823 (Ct. App. 1985) (footnote omitted). To answer that question in the affirmative, there must be "evidence . . . show[ing] that the defendant acted maliciously or in willful or reckless disregard of the plaintiff's rights . . .." *Id.* (footnote omitted).

Here, Manley acknowledged that he had known Esser for several years and that in that time she would have come to trust him. He also acknowledged that the guaranty she signed had no figures on it, and that one of

the other documents, an "Explanation of Personal Obligations" given to her at the time showed her obligation to the bank only in the amount of the $4,800 truck loan. Manley knew that Esser had co-signed loans before, but did not know whether she had ever signed a guaranty. He stated that he carefully explained everything to Esser and Johnson before the documents were executed, at one point sending both of them out into the lobby with instructions to give the matter more consideration because of the significant financial obligations Esser would be assuming in the transaction. He said he was certain that he explained everything to Esser—particularly the fact that the guaranty would make her liable for the full amount of both of Johnson's loans, the old debt of $27,500, as well as the "new" $4,800 loan.

Johnson testified that Manley did not explain the documents at all, but simply "slid the papers" across the table, telling Esser " 'you sign here.' " According to Johnson, the entire transaction took less than two minutes. He stated that Manley had never told him the bank needed Esser's guaranty of other debts in order to make the truck loan, but only her co-signature on the truck loan documents. He also testified that Manley never suggested that he and Esser go to another room to discuss the matter, and that that event occurred in the context of another loan transaction at another date and time. Finally, when Johnson was asked whether it was true that Manley "[explained] to you and your sister in detail the obligations that you were undertaking," he responded: "He did not. We were signing loan papers on the truck, there was nothing else."

Esser agreed with Johnson that the loan transaction took only a few minutes, and that "[t]here wasn't a great deal of conversation." According to Esser, Manley simply handed her the papers, saying "these are the papers

for the new loan," and asked her to sign them. When asked whether Manley told her why she was being asked to sign the loan documents, she responded: "It was kind of a routine thing, I was there to sign the loan paper, yes, because [Johnson] did need a co-signer . . . [f]or the new loan." And, when asked whether Manley had ever advised her that she was also signing a guaranty for the $27,500 debt, she stated: "Absolutely not . . . [if I knew I was guaranteeing that loan], I would not have signed it . . . [because it] was an uncollectible debt . . .. I knew it [and] I am sure that [Manley] knew that." Esser also stated that Manley handed her the guaranty along with several other papers, and that while she did not read it line-by-line, she noticed that it did not contain any figures.

Finally, Esser testified that she had known Manley for at least five years before signing the guaranty, that she had dealt with him on several occasions, and that she "relied on him" and "had confidence in him." Because of her "faith" in bankers in general, and in Manley in particular—and given his representations to her—she stated that she "had no reason to doubt when signing these papers . . . that it was only for the new loan."

We believe these facts warrant the conclusion that a question on punitive damages should have been submitted to the jury.

This is not a case where the bank officer simply failed to disclose the terms of a document. It is one in which there was evidence of active misrepresentation. The jury could believe from the credible evidence in this case—and obviously did, as its answers to the misrepresentation questions indicate—that Manley, knowing that Esser trusted and relied on him, and knowing that

she had assets adequate to cover her brother's earlier uncollectible debt, and knowing also that she had not read the documents thoroughly, made certain representations to her that reasonably led her to believe that she was signing papers that would make her liable only for some $4,800, rather than for an amount in excess of $33,000, as the papers actually provided. From that evidence, a jury could determine that Manley's actions were undertaken in willful or reckless disregard of Esser's rights. It follows that Esser's request for a jury question and instructions on punitive damages should have been granted by the trial court and that a new trial, limited to that issue, is warranted.

We therefore reverse the judgment insofar as it denied Esser's motion for a new trial on the issue of punitive damages and we remand for a new trial on that limited issue. In all other respects, we affirm the judgment.[4]

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded for further proceedings consistent with this opinion. No costs to either party.

DYKMAN, J. *(dissenting).* When courts decide to make substantial changes in the way business must be done in Wisconsin, two problems usually arise. First, the impact of the change, and its burden on ordinary business transactions is not considered, because the usual inquiry and debate of the legislative process is bypassed.

---

[4]The dissenting opinion constructs its own straw-man version of our decision in this case in order, we assume, to be better able to tear it down with such authority and finality. The dissent characterizes the decision as doing a variety of things—from "overrul[ing]" a supreme court case to creating a "new tort." It does none of those things. We disagree with each and every one of the dissent's characterizations of the majority opinion.

The beliefs of a very few persons are substituted for that process. The supreme court has cautioned:

> [B]efore a change in the law is made, a court, if it is to act responsibly, must be able to foresee with reasonable clarity the results of its decision and to say with reasonable certainty that the change will serve the best interests of society.

*Hoven v. Kelble,* 79 Wis. 2d 444, 470, 256 N.W.2d 379, 392 (1977).

The second problem is that other issues in the case must be dealt with in a manner that permits the court to reach the main issue. This results in changes in other areas of law where no need for change exists. Here, unnecessary changes are made in summary judgment methodology, punitive damages analysis and negligence law.

## SUMMARY JUDGMENT

Summary judgment methodology is purely statutory and has been reviewed many times. *See, e.g., In re Cherokee Park Plat,* 113 Wis. 2d 112, 115–16, 334 N.W.2d 580, 582–83 (Ct. App. 1983). In *Kallembach v. State,* 129 Wis. 2d 402, 407, 385 N.W.2d 215, 218 (Ct. App. 1986), we considered whether a trial court's erroneous denial of a motion for summary judgment should be reviewed using standard summary judgment methodology. After noting the state's insistence that we ignore an adverse jury verdict, and review only the order denying its motion for summary judgment, we said:

> We also note that this is not the first time that a plaintiff successful before a jury risks ultimate defeat for the trial court's failure to grant summary judgment to the defendant. In *Gross v. Midwest Speed-*

30

*ways, Inc.,* 81 Wis. 2d 129, 260 N.W.2d 36 (1977), the plaintiff obtained a favorable judgment following a jury trial. The defendant appealed from the judgment on the ground that its motion for summary judgment should have been granted. The *Gross* court held that the defendant had not waived the right of review and that summary judgment should have been granted. The court reversed and remanded with instructions to grant summary judgment dismissing the complaint. (Footnote omitted.) *Id.*

The same situation presents itself here. There is no reason to limit *Gross* and *Kallembach* to cases where a motion for a directed verdict is not made. The majority further confuses summary judgment methodology because it suggests a "possible retrial" were it to follow *Kallembach.* A grant of summary judgment terminates the litigation. Summary judgment methodology is needlessly complicated where no one suggests that this complication is necessary.

## PUNITIVE DAMAGES

The record does not reveal why Esser brought a counterclaim in which she alleged the same cause of action she had previously asserted as an affirmative defense. Section 802.02(3), Stats., provides that fraud is an affirmative defense, and that where a party has mistakenly designated a defense as a counterclaim, the court should permit amendment of the pleading to conform to a proper designation. However, the bank did not object to Esser's use of an affirmative defense as a counterclaim. This procedure led to unusual results, such as the trial court granting the bank's motion for a directed verdict, though the jury had yet to consider Esser's contention that she was not liable on her guarantee because of the bank's fraud.

Nonetheless, the parties ultimately concluded that the result of a verdict favorable to Esser would mean that Esser's "damages" would be identical to the amount owing on the note, causing neither party to owe each other anything. The court's judgment reflected this conclusion, and it is apparent from the majority opinion that this is a case where the plaintiff had no damages. "A general and perhaps almost universally accepted rule is that punitive damages cannot be awarded in the absence of actual damages." *Tucker v. Marcus,* 142 Wis. 2d 425, 438–39, 418 N.W.2d 818, 823 (1988).[1]

The majority's decision to announce a new tort necessarily requires that it overrule *Tucker,* for in debtor and creditor cases, the result of oral nondisclosure of the terms of a note or guarantee will always be that the "damages" of the debtor will equal the amount due on the note. Thus, a "universally accepted rule" falls because the majority has concluded that the relationship between debtor and creditor must be altered.

## NEGLIGENCE

Another longstanding rule falls victim to the new tort promulgated today. We recently reaffirmed that generally, as a matter of law, "a person is negligent if he or she signs a contract without ascertaining its contents and is not prevented from doing so, even if induced to sign by fraudulent misrepresentations." *Ritchie v. Clap-*

---

[1] *Tucker* goes further to explain that actual damages does not mean a harm or injury, but an "actual injury *which would justify an award of actual or compensatory damages . . ..*" *Tucker,* 142 Wis. 2d at 440, 418 N.W.2d at 823 (quoting *Hanson v. Valdivia,* 51 Wis. 2d 466, 474, 187 N.W.2d 151, 155 (1971)) (emphasis added in *Tucker*). There is nothing in this case which would justify an award of actual damages.

*pier,* 109 Wis. 2d 399, 404–05, 326 N.W.2d 131, 134 (Ct. App. 1982). In *Ritchie,* the person who signed a document without reading it was a college graduate and a real estate salesman. The document was entitled "QUIT CLAIM DEED." We concluded that as a matter of law, the deed signer was negligent for not reading the deed. *Id.* at 406, 326 N.W.2d at 134–35.

Esser had one and one-half years of college where she studied accounting, and did well. She was a branch manager for an insurance company in Madison for ten years, and trained agents to sell life insurance. She also supervised secretaries and prepared information for tax returns. She had worked for six years for an insurance company in Appleton, where she was a junior executive. She had been an officer at Cottage Grove State Bank, and had worked at First Wisconsin National Bank in Madison. The document she signed was captioned "Wisconsin Banker's Association form 151—CONTINUING GUARANTY (unlimited)."

I question the majority's assertion that Esser had no special experience or knowledge that would excuse her from reading and understanding the guarantee she signed. The majority admits that the general rule is that a person is negligent for not reading a document that he or she signs. Esser is at least an average bank customer, if not a seasoned veteran of the business world. I do not see much difference between Esser's financial sophistication and that of the real estate salesman in *Ritchie.* If Esser is not covered by the general rule, then virtually all bank customers are not covered by the general rule. The "general rule" is thus made applicable to virtually no one.

## TORT OF ORAL NONDISCLOSURE

The majority finds the bank liable for punitive damages because its agent did not orally disclose a term of the guarantee Esser signed. The only statements made by the bank's loan officer were "These are the papers for the new loan" and "You sign here." The majority finds these two statements sufficient to subject the bank to punitive damages because the loan officer did not go further and orally explain the terms of Esser's guarantee to her.

The majority attempts to minimize the breadth of its new rule by suggesting "This is not a case where the bank officers simply failed to disclose the terms of a document." Majority opinion at 28. Were that assertion correct, this dissent would be unnecessary. The rule of *stare decisis,* however, is that similar fact situations should yield similar results. Therefore, those using this case as precedent will look not to the majority's assertions, but to the facts of this case. Those facts describe the usual, mine-run "closing," which occurs every day when a commercial or consumer loan is made. The facts of this case, and of most loan closings are:

1. A previous relationship between lender and borrower (here, 5 years).
2. A brief closing (here, less than two minutes) with little conversation.
3. Innocuous statements by lender's agent (here: "These are the papers for the new loan" and "you sign here.").
4. Several loan documents written on standard forms.
5. Testimony by the borrower that he or she trusted the lender's agent, and that he or she did

not read the documents that the borrower signed.

6. Loan documents containing extensive agreements which protect the lender if the borrower defaults, together with disclosure documents required by federal and state legislation.

If these facts are present, and they will be in most cases, trial courts will follow the majority opinion and conclude that the tort of oral nondisclosure has been alleged, or proven. The jury will then determine the amount of punitive damages the lender should pay the borrower.

It is apparently irrelevant that a claim for punitive damages alone is not sufficient to support a cause of action. *Hanson,* 51 Wis. 2d at 474, 187 N.W.2d at 155. The disclosure requirements of the Wisconsin Consumer Act consumer credit transactions, subchapter III, ch. 422, Stats., and those of the Truth in Lending Act, 15 U.S.C. secs. 1601 *et seq.,* even if followed exactly, as they were here, are no defense to this new tort. It is not significant that a debtor signs a document which contains the terms of an agreement, and it is not enough that a debtor signs an "Explanation of Personal Obligation" which warns: "This explanation is not the agreement under which you are obligated, and the guaranty or agreement you have executed must be consulted for the exact terms of your obligations." Esser signed such documents.

The majority's rule requires a lender, at its peril, to assure that a debtor cannot testify that he or she did not understand a part of a contract that he or she signed. We do not require so strict a test when determining whether a guilty plea in a criminal case may be withdrawn. *State v. Bangert,* 131 Wis. 2d 246, 267–68, 389 N.W.2d 12, 23 (1986). Lending institutions are now *de facto* fiduciaries

35

with respect to their customers, a holding we only recently disavowed except where "special circumstances" exist. *Production Credit Ass'n v. Croft*, 143 Wis. 2d 746, 755, 423 N.W.2d 544, 547 (Ct. App. 1988).

The result of adopting the new tort of oral nondisclosure will certainly affect the public. In *Citizens State Bank v. Timm, Schmidt & Co.*, 113 Wis. 2d 376, 384, 335 N.W.2d 361, 365 (1983), the court considered the economic costs of its decision:

> If relying third parties, such as creditors, are not allowed to recover, the cost of credit to the general public will increase because creditors will either have to absorb the costs of bad loans made in reliance on faulty information or hire independent accountants to verify the information received.

Few persons will benefit from the higher interest rates required to cover the costs of defending against the new tort of oral nondisclosure.

We are an error correcting court. *State ex rel. Swan v. Elections Bd.*, 133 Wis. 2d 87, 94, 394 N.W.2d 732, 735 (1986). We will necessarily have a high volume of cases which should be reviewed soon after briefing is completed. Unnecessarily going beyond a search of existing law is time consuming, and interferes with our ability to timely address the issues of other cases. We could have easily avoided this. Until now, this type of case was decided by an inquiry into the relationship between the debt for which a mortgage was taken or a guarantee signed, and the debt sought to be included in the ambit of the mortgage or guarantee. Examples of this type of case are *John Miller Supply Co. v. Western State Bank*, 55 Wis. 2d 385, 199 N.W.2d 161 (1972), *Capocasa v. First Nat. Bank*, 36 Wis. 2d 714, 154 N.W.2d 271 (1967),

and *Schmitz v. Grudzinski*, 141 Wis. 2d 867, 416 N.W.2d 639 (Ct. App. 1987).

*John Miller, Capocasa* and *Schmitz* examine dragnet clauses in documents similar to the clause in the guarantee Esser signed. In *Schmitz*, we repeated the rule that courts will examine the relationship between the debt sued upon and the document creating the debt. 141 Wis. 2d at 874–75, 416 N.W.2d at 642. The *Schmitz* document was a real estate security agreement, but the theory is no different here. Following *Schmitz*, we should determine whether the relationship between the truck loan and the business loan is "so . . . unclear that as a matter of public policy a court will refuse to enforce the clause . . .." *Id.*

I conclude that the nexus between the truck loan and the business loan which had been discharged in bankruptcy is so wholly unrelated that as a matter of public policy I would refuse to enforce the guarantee as it relates to the business loan. The "no big surprises" rule of *Schmitz* illustrates and dictates this result. 141 Wis. 2d at 874, 416 N.W.2d at 642. There is no need to adopt a new tort to reach a just result in the case before us.