355 F.2d 1
 N. Louis TRISCARO, Charles Ralph, Joseph Morrow, Pat Ranallo, Frank Colombi, Ernest M. Green, Arthur Reitz, Howard Renker, George Breckling, and Joseph Babin, as Trustees of the Excavating, Building Material & Construction Drivers Union Local #436, Welfare Fund, Plaintiffs-Appellants,
v.
The UNION LABOR LIFE INSURANCE COMPANY, Inc., Defendant-Appellee.
 No. 16198.
 United States Court of Appeals Sixth Circuit.
 January 27, 1966.
 
 1
 Alfred Palay, Cleveland, Ohio, William H. Rosenfeld, Rosenfeld & Palay, Cleveland, Ohio, on brief, for appellants.
 
 
 2
 Ivan H. Wolpaw, Cleveland, Ohio, and Raymond O'Connor, New York City, Meyer T. Wolpaw, Wolpaw & Wolpaw, Cleveland, Ohio, Hugh Reilly, Mahoney, Spohr & Mahoney, on brief, for appellee.
 
 
 3
 Charles D. Lindberg, Taft, Stettinius & Hollister, Cincinnati, Ohio, on brief for amicus curiae, Life Ins. Ass'n.
 
 
 4
 Before WEICK, Chief Judge, EDWARDS, Circuit Judge, and BROWN, District Judge*.
 
 
 5
 BAILEY BROWN, District Judge.
 
 
 6
 The appellants, Trustees of the Excavating, Building Material and Construction Drivers Union, Local No. 436, Welfare Fund, hereinafter referred to as the "Trustees," sought a declaration of their right to receive payment of an additional amount under a "Dividends" provision of policies of group insurance issued by the appellee, Union Labor Life Insurance Company, Inc., hereinafter referred to as the "Company." Jurisdiction is based on diversity of citizenship. The parties concede that Ohio law governs. The trial court, sitting without a jury, held for the Company and the Trustees have appealed.
 
 
 7
 In 1952, this Welfare Fund was established to receive and administer funds paid over by employers for the benefit of the members of the union. As a part of their program the Trustees determined that they would obtain group insurance for the members. After consideration by the Trustees of the proposals of various insurance companies, they elected to award the business to the Company, effective November 1, 1952. Pursuant to this award the Company issued four master policies of group insurance. The principal policy provision pertinent to this action was substantially the same in all policies. It read as follows:
 
 
 8
 "DIVIDENDS. This policy shall participate annually in the distribution of divisible surplus as ascertained and apportioned by the company at the end of each policy year, * * * but the financial experience under this policy shall be combined with the financial experience of all other group policies issued to the said policyholder by the company for the purpose of determining the divisible surplus hereunder. All dividends shall be paid to the policyholder in cash, or may, at the request of the policyholder, be applied toward the payment of any premium hereon * * *."
 
 
 9
 It is the interpretation and effect of this provision which is the determinative issue of this lawsuit.
 
 
 10
 Following the anniversary dates of these policies, beginning in 1953 and continuing successively through 1957, the Company submitted to the Trustees a combined "experience summary" as to these policies showing a divisible surplus and paid the indicated amount to the Welfare Fund. For the policy period ending October 31, 1958, however, no amount was paid since the combined experience summary showed that the Company sustained a deficit of $89,223 as to these policies during that period. As a result of this adverse financial experience, the Company notified the Trustees, before the end of the policy year, that an increase in premium would be required for the following year. Upon being so notified, the Trustees requested a continuation of the existing premium rates for a short period of time during which they would investigate the possibility of placing the insurance elsewhere. The extension was granted by the Company for the month of November, 1958, but during that month the Trustees notified the Company that they were continuing the policies, and the increased premium rates were effective December 1, 1958. Following the policy period ending November 30, 1959, the Company submitted a combined experience summary which showed a divisible surplus as to these policies for the year of $145,095, but from which the deficit of the prior year of $89,223 was deducted, leaving a balance of $55,872. The amount of $55,872 was therefore paid to the Welfare Fund, but the Trustees at that time protested the Company's right to set off the deficit incurred in 1958 against the divisible surplus of 1959. The Company did thereafter review the "contingency reserves," which it had created each year, for the entire period the policies had been in effect, and based upon this review, the Company tendered to the Welfare Fund the additional sum of $38,728. In consideration for this payment, however, the Company insisted that the Trustees execute a release of any and all claims. The Trustees refused to do so, and this amount was not paid by the Company. The Trustees then filed this action. The Company at the trial admitted its liability to the Trustees to this extent, and therefore the trial court, while holding for the Company as to its right to offset the deficit against the divisible surplus, entered a judgment against the Company in the amount of $38,728.
 
 
 11
 Beginning in 1940, the board of directors of the Company adopted a formula to determine each year the amount to be paid the group policyholders under the "Dividends" provision of the policies, and from year to year, the board amended this formula as in its judgment was proper. The Company each policy year applied this formula to the combined financial experience with respect to all group policies issued to each policyholder. The formula provided, in general, that from the total premiums collected from a policyholder there would be deducted certain costs such as claims paid, commissions, and contingency reserves, and any excess was paid to the policyholder as a "dividend." The applicable formula was generally reflected by the contents of the "experience summary" furnished to the policyholder each year. In 1953, the board amended the formula to provide, in substance, that a policyholder's deficit for a year as determined by the formula would be carried forward four years and applied against the policyholder's divisible surplus as determined by the formula. It is the application of this amendment of the formula that brought about the dispute that led to the filing of this action.
 
 
 12
 As indicated, the ultimate issue between the parties is whether the deficit for the policy year ending in 1958 could be deducted from the divisible surplus for the policy year ending in 1959. The Trustees, it is clear from the record, presented and tried this case on the theory that the policies, construed within their four corners, required that the 1959 dividend be paid without the deduction. More particularly, the Trustees took the position that the policies by their terms required that the divisible surplus as ascertained and apportioned by the Company in accordance with the financial experience for each separate year must be paid. The Company contended on the other hand that, under the authority reserved to it by the above-quoted provision of the policies to ascertain and apportion divisible surplus, deficits may be offset so long as the Company acted in good faith. The trial court decided this issue adversely to the Trustees.
 
 
 13
 On appeal, the Trustees broaden their attack. They now contend that, because of the effect of certain letters, the experience summaries furnished by the Company and other dealings between the parties and because of the effect of certain Ohio statutes, the obligation of the Company under the above-quoted policy provision was not to pay dividends but rather to make a "readjustment of rates" or to "return unearned premiums" and further that this obligation was to readjust the rates or to return the unearned premiums for each policy year separately. The Company contends, on the other hand, that the Trustees are now foreclosed from asserting this theory of recovery because it was not presented in the trial court and that, in any event, we are dealing with dividends and not readjustment of rates or return of premiums and that the Ohio statutes upon which the Trustees now rely are not applicable to the payment of dividends.
 
 
 14
 We will first address ourselves to the contention originally made by the Trustees and then will address ourselves to these additional contentions made on this appeal.
 
 
 15
 * In support of their original position that dividends must be determined and paid for each separate year, the Trustees first contend that the policies are each of a year's duration. This contention is not supported by the terms of the policies and the record. The policies provide in substance that, if the premiums are paid, they will continue in effect from year to year, subject to the right of termination by either party. Moreover, the parties stipulated that the policies remained in effect, as modified from time to time, from November 1, 1952 until November 30, 1959.
 
 
 16
 Next, the Trustees rely on the words in the above-quoted "Dividends" provision to the effect that the policyholder was to "participate annually" in the distribution by the Company "at the end of each policy year." We construe this language, in view of the authority reserved to the Company to ascertain and apportion, as indicating nothing more than that the divisible surplus as to each policyholder was to be determined annually or, as stated by the trial court, as indicating nothing more than that the statement period would be the policy year.
 
 
 17
 Next, the Trustees rely on the absence of specific authority in the "Dividends" provision to offset a deficit of a past year against a current divisible surplus. The answer to this argument is that this provision does specifically reserve to the Company the right to ascertain and apportion divisible surplus as to each policyholder, and therefore it reserves to the Company the right to exercise its good faith discretion in the adoption of a formula which provides for offsetting a deficit. 6 Couch on Insurance (2d), Secs. 34.120, 34.121, p. 847.
 
 
 18
 The Trustees point out, which is true, that had they cancelled the policies at the end of the deficit year, the Company would have had no right to collect the deficit from them. It further appears, as the Trustees point out, that they had no notice that this deficit would be applied against a future surplus. (It also appears that the Trustees were not advised that the deficit would not be so applied.) The Trustees further argue (without support in the record) that they would not have continued the insurance with the Company had they known that the deficit would be deducted from a future surplus. Again, the complete answer to all of this is that by the terms of the policy the Trustees had agreed that the Company have discretion in ascertaining and apportioning divisible surplus so long as it acted in good faith. The Trustees do not contend that the formula which had been adopted by the board of directors and was in effect during the policy year ending in 1959 was not correctly applied or that the Company otherwise failed to exercise good faith.
 
 
 19
 Lastly, the Trustees contend, assuming now that the policies were not of a year's duration, that the amendment to the formula providing for carrying forward of deficits for four years cannot be made applicable to these policies because the amendment was adopted by the board after these policies became effective on November 1, 1952. Again, the answer is that the Company had discretion under the terms of the policy to change the formula for ascertaining and apportioning divisible surplus. Further, the record shows that, at the time that these policies became effective, the formula provided that deficits would be carried forward one year, which is sufficient authority for what was done here.
 
 
 20
 We therefore conclude that the trial court was correct in its determination that, under the policies as construed within their four corners, the Company had the right to offset the 1958 deficit against the 1959 divisible surplus and dividend.
 
 II
 
 21
 As stated, on appeal the Trustees broaden their attack, contending that we are not dealing with an obligation to pay dividends at all but rather with an obligation to make an annual "readjustment of rates" or "return of unearned premiums." It is true, as the Company contends, that this theory was not presented to the trial court; however, we will not deal with the Company's contention that the Trustees are thereby foreclosed to rely on this theory here. Rather, we prefer to deal with the merit of this contention. Moreover, though specifically conceding that the "Dividends" provision in the policies is not ambiguous, the Trustees then proceed to rely on letters, the experience summaries and conduct of the parties. It appears to us that the Trustees may well be foreclosed by the parol evidence rule, but again we prefer to deal with the ultimate merit of their contention.
 
 
 22
 In support of their argument that we are dealing with an obligation to make an annual readjustment of premium rates, the Trustees rely on a letter written by the Company in October, 1958, in response to an inquiry from the Trustees concerning "return of premium," in which it was stated that "there will be no return of premiums" if the policies terminate on other than a renewal date. It is not absolutely clear whether the Company, in adopting the nomenclature of the Trustees, intended to refer to the amounts to be paid under the "Dividends" provision. Assuming that it did, there is no indication that the Company intended thereby to waive or alter its rights under the "Dividends" provision or to place an interpretation on that provision other than the obvious one. Further, the Trustees point out that the experience summaries furnished to them show that the amount paid was always equal to the amount by which the premium collected from the Welfare Fund exceeded certain costs attributable to these policies. The answer is that, in exercising their discretion under the "Dividends" provision, they adopted this particular formula for determining, not a return of premium, but rather an amount of divisible surplus to be paid to this policyholder. There could not, of course, be a "divisible surplus" for any policyholder unless the Company had an overall surplus.
 
 
 23
 It is true, as the Trustees point out, that the amount of premiums varied from year to year based on financial experience under the policies, that is, the premiums charged represented "experience rates." But the changes that were made were never retroactively effective; they were made effective, in each case, for the coming year. It should be noted further, in this connection, that the Company made no contention with respect to the deficit year that it was then entitled to readjust the premium upward for that year.
 
 
 24
 We therefore conclude that, even if we may go outside the terms of the policies and consider the foregoing matters now urged by the Trustees, we are not dealing with an obligation to readjust premium rates or to return unearned premiums.
 
 
 25
 The Trustees, first assuming that we are dealing with a readjustment of rates of premium, rely on a provision of the Ohio Revised Code, Section 3917.02, which reads as follows:
 
 
 26
 "No domestic life insurance company shall issue any policy of group life insurance, the premium for which is less than the net premium based on the commissioners 1941 standard ordinary mortality table with interest at three per cent per annum, plus a loading, the formula for the computation of which shall be determined by the superintendent of insurance. A foreign life insurance company which does not conduct its business in accordance with such requirement shall not do business in this state. However, any such policy may provide for a readjustment of the rate based on experience at the end of the first or any subsequent year of insurance, which readjustment may be made retroactive for such policy year only."
 
 
 27
 They argue from this statutory provision that a readjustment of rates may be made for the current policy year only. The answer to this argument is, as we have already determined, that we are not dealing with policies providing for readjustment of rates. Further, it should be noted, as the Company points out, that if this statutory provision were applicable, the Company would have been entitled to readjust the premium for the deficit year and thereby collect the deficit from the Welfare Fund.
 
 
 28
 We should note, before closing this opinion, that we have not had to deal with the jurisdictional issue as to whether a court may exercise visitorial powers with respect to questions of internal management. (See: Relief Association, etc., v. Equitable Life Assurance Society, 140 Ohio St. 68, 42 N.E.2d 653 (1942)). This is true because it is the position of the Trustees that the Company did not have the discretion to offset a past deficit against a current divisible surplus that it claimed to have; it was not their contention that the Company, having this discretion, improperly exercised it.
 
 
 29
 There was also an issue as to whether the Company was entitled to include the month of November, 1958, in the experience summary for the policy year ending on November 30, 1959. This issue, in view of the decision by this court, is moot.
 
 
 30
 It results that the judgment of the trial court is
 
 
 31
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Honorable BAILEY BROWN, United State District Judge for the Western District of Tennessee, sitting by designation