Leon GELLER, Eli Bloom, Irwin Katz, James E. Farley and Mark Herrmann, Trustees of GNY Automobile Dealers Health & Welfare Trust, formerly known as Greater New York, Long Island, and Westchester Automobile Dealers Association Insurance Fund, Plaintiffs,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.

No. 96–CV–0976 (FB).

United States District Court, E.D. New York.

Oct. 8, 2002.

Terrence P. O'Reilly, Foley, Hickey, Gilbert & O'Reilly, New York, NY, for the Plaintiffs.

Kenneth J. Kelly, Epstein, Becker & Green, P.C., New York, NY, for the Defendant.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Plaintiffs are the trustees of the Greater New York Automobile Dealers Health & Welfare Trust ("Trust").[1] "The Trust is a multiple employer welfare benefit plan providing payment and/or reimbursement for certain hospital, surgical and medical expense benefits" to participating members of the Greater New York Automobile Dealers Association. Am. Compl. ("complaint") at ¶ 1. As such, it is governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Defendant, Prudential Insurance Company of America ("Prudential"), is a mutual insurance company, and insured the Trust under a group contract ("Contract") that provided for, among other things, coverage of major medical expenses. The complaint alleges sixteen claims for monies due from Prudential, totaling approximately $3 million dollars, related to the termination of the Contract as of January 1, 1994. Prudential's answer asserts two counterclaims, totaling approximately $850,000. The Trust has moved for summary judgment on the First through Sixth, Ninth and Tenth claims; Prudential has cross-moved for summary judgment on each of these claims, as well as its two counterclaims.[2]

The First, Third, Fifth and Ninth claims are common law state claims, and plaintiff's complaint sought to invoke the Court's supplemental jurisdiction under 28 U.S.C. § 1367 for the resolution of these claims. Primary federal question jurisdiction was invoked under 28 U.S.C. 1331 because each of these claims was also alleged, in separate sequential claims (the Second, Fourth, Sixth and Tenth claims), to constitute a breach of fiduciary duty by Prudential under ERISA.

On April 9, 2002, the Court issued a memorandum *sua sponte* raising "considerable concerns regarding the basis for original jurisdiction over all of the claims alleged," *Geller v. Prudential Insur. Co. of Am.,* No. 96–CV–0976, 2002 WL 539046, at *1 (E.D.N.Y. April 9, 2002), and ordered the parties to address these concerns in separate submissions. *Id.,* at *3. Thereafter, the parties submitted a joint response asking the Court to consider diversity jurisdiction as an "alternative basis for subject matter jurisdiction." Joint Ltr. Def. and Pl. (May 6, 2002). In a memorandum

---

1. "Plaintiffs are the individual trustees of the Trust and are named only as nominal plaintiffs. The real plaintiff in interest is the Trust." Payton Aff. ¶ 2. (Payton is the Fund Administrator of the Trust.).

2. All of Prudential's submissions allude to a cross-motion for summary judgment with respect to the claims for which the Trust is moving for summary judgment. *See* Def.'s Mem. Opp'n at 1; Hayes Cert. at ¶ 1 (Hayes was a manager and account underwriter in the underwriting unit of Prudential from April 1989 to August 1999.); Goldberg Cert. at ¶ 1 (Goldberg is one of Prudential's attorneys). Although the Court is unaware of any such motion having been filed, it notes that, in addition to Prudential's submissions, it has received copies of correspondence between both parties indicating that Prudential's cross-motion shall be subsumed in its papers in opposition to plaintiff's motion. *See* Def.'s Lett. dated June 1, 2000; Pl.'s Lett. Resp. dated June 2, 2000. The Court, therefore, construes the opposition papers, certifications, correspondence and other papers submitted by the defendant as a cross-motion for summary judgment on the same issues raised by the plaintiff. *See New Destiny Dev. Corp. v. Piccione,* 802 F.Supp. 692, 693 n. 2 (D.Conn. 1992) (construing defendant's motion to dismiss and brief in opposition to motion for summary judgment as a cross-motion); *see also U.S. Underwriters Ins. Co. v. Roka LLC,* 99 Civ. 10136, 2000 WL 1473607, *2 n. 4 (S.D.N.Y.2000) (construing defendant's affirmation and other papers as a cross-motion for summary judgment).

dated June 5, 2002, the Court construed this letter as "a concession by both parties that there is no basis for asserting federal question jurisdiction," *Geller v. Prudential Insur. Co. of Am.*, No. 96–CV–0976, 2002 WL 1285538, at *1 (E.D.N.Y. June 5, 2002), and dismissed all of plaintiff's ERISA claims;[3] however, it deemed the complaint to be amended to plead diversity jurisdiction over the state law claims. *Id.* The parties subsequently satisfied the Court in a further submission that it indeed had diversity jurisdiction over those claims. Presently before the Court, therefore, is the Trust's motion for summary judgment on Claims 1, 3, 5 and 9, and Prudential's cross-motion for summary judgment on these claims and its two counterclaims.[4]

Briefly, those claims and counterclaims concern the following. *Claim 1:* Whether Prudential was entitled to a credit, at the time of payment of dividend monies due to the Trust upon termination of the Contract, for a premium deficit during the 1991 policy year that Prudential carried forward until the Contract was terminated; *Claims 3 and 5 and Counterclaim 1:* Whether Prudential was entitled to deduct from dividend payments due to the Trust, or recoup from the Trust, certain disputed amounts of monetary contributions made to New York State insurance stabilization pools by Prudential on behalf of the Trust; *Claim 9:* Whether the Trust is entitled to reimbursement from Prudential for costs incurred by the Trust for a bone marrow transplant on behalf of a Trust participant; *Counterclaim 2:* Whether Prudential was entitled to reimbursement for unpaid (or "runout") claims that were discovered by Prudential after the Contract terminated.[5]

For the reasons set forth below, the motions are denied in part and granted in part.

## GENERAL FACTUAL BACKGROUND

The following facts are gleaned from the parties' submissions, as amplified and explained by the statements of counsel during oral argument. They are undisputed, except as otherwise noted.

From January 1, 1989 until March 1992, the Contract provided for a "fully insured" plan for the Trust. Hayes Cert. ¶ 5; Payton Aff. ¶ 5. Under this plan, the Trust paid premiums, at a rate determined by Prudential, for coverage of the medical expenses of the Trust's participants. The premiums were calculated by Prudential based on three factors. The first component was for anticipated bills for medical services (both for claims paid

---

3. In addition to the dismissal of Claims 2, 4, 6 and 10, this also entailed dismissal of claims 8, 12 and 14. *See Geller*, 2002 WL 1285538, at * 1 n. 1.

4. At an oral argument after the Court rendered its decision dismissing the ERISA claims, plaintiff disagreed with the Court's interpretation of the parties' joint letter that it constituted a concession that ERISA jurisdiction was absent; nonetheless, in light of the Court's disposition of the plaintiff's summary judgment motion in respect to its state claims, resolution of the ERISA claims for which plaintiff seeks summary judgment is academic.

5. The remaining state law claims, which are not before the Court on this motion, are

*Claim 7:* for interest due the Trust by reason of Prudential's alleged failure to make a timely reimbursement to the Trust for certain medical expenditures; *Claim 11:* for interest on a certain run-out reserve sum that allegedly was not timely paid to the Trust; *Claim 13:* for recoupment of $353,236, plus interest, for use of trust funds by Prudential to provide insurance coverage for certain allegedly unauthorized experimental medical treatments; *Claim 15:* for an accounting of the Trust's share of a class action settlement that Prudential paid to the Trust, and *Claim 16:* for an accounting of all unpaid claim checks that the Trust has provided funding for and which Prudential has not returned.

and claims incurred but unpaid). On a yearly basis, a portion of the premium relating to the incurred but unpaid claims was carried over to the following year— referred to as the "reserve." As the reserve was carried over yearly, it built up on behalf of the Trust. The second component of the premium was the cost of doing business (including administrative expenses, state premium taxes, risk charges, profit and interest). The third component was a margin (an amount to cover the possibility that actual claims may exceed anticipated claims). *See* Hayes Cert. ¶ 6. In addition to including a margin amount, the Contract contained an Additional Premium Clause ("APC"). The APC permitted Prudential to request payment of additional money at the end of a policy year to cover that year's unanticipated claims. At times, a deficit would occur when the paid and incurred but unpaid claims, plus Prudential's cost of doing business, exceeded the premiums collected. This could occur even after the payment of an additional premium pursuant to the APC.

Beginning March 1, 1992, the Contract was amended from a fully-insured plan to a partially self-insured plan. As a practical matter, the change in policy type did not significantly alter the relationship between the parties. The Trust continued to pay premiums to Prudential, and "claims were paid out of a custodian account maintained by Prudential and funded with regular payments from the Trust." Hayes Cert. ¶ 9. Prudential retained responsibility for paying claims that exceeded the benefit maximum. Premiums were still set by Prudential, and paid every month by the Trust, largely for the purpose of covering Prudential's administrative expenses (cost of doing business). Extra premiums were assessed, as necessary, at the end of each year.

Invariably, in those policy years when paid premiums exceeded expenses, and Prudential realized the profit it expected to make as part of the administration of the Contract, the balance of any excess was returned to the Trust by operation of a dividend formula. Payment of dividends was governed by the following Contract provision:

> Prudential will determine the share, if any, of its divisible surplus allocable to the Group Contract as of each Contract Anniversary, if the Group Contract stays in force by the payment of all premiums to that date. The share will be credited to the Group Contract as a dividend as of that date.

Complaint, Ex. 1. The dividend formula was a complicated formula that was approved each year by Prudential's Board of Directors. *See* Hayes Cert. ¶ 14 and Ex. D (dividend formula for 1992).

The Contract provided that it may be terminated by either party as of any anniversary date. *See* Hayes Cert. ¶ 14 and Ex. A, at § 2–8 (Contract). The decision to terminate was Prudential's; the reason, apparently, was because of certain legislation enacted by the New York State Legislature the prior year which Prudential believed was inimical to its business interests. *See* Def.'s 56.1 Statement ¶ 30. Upon termination, Prudential, applying its dividend formula, paid a dividend to the Trust of approximately $1.17 million dollars after deducting various sums in two installments, the first on June 30, 1995 for $ 647,162, the second on September 5, 1995 for $520, 383. *See* Hayes Cert. ¶ 25, Def. Ltr at 4, June 14, 2002. The propriety of these deductions, as well as various other claims by the parties as a consequence of the termination, is the subject matter of all but one of the disputes now before the Court.

## RESOLUTION OF CLAIMS AND COUNTERCLAIMS

Summary judgment is required where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), "i.e., '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Regional Economic Community Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 45 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "An issue of fact is genuine if the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party." *Id.* (internal quotation marks and citation omitted).

### I. Claim 1: 1991 Deficit

■ For the 1991 policy year, the Trust's claims and administrative expenses exceeded premiums paid, creating a deficit of $1,672,983. To prevent a deficit from occurring again the following year, Prudential made an additional premium call to the Trust in the amount of $471,230, which was paid. As a consequence of the termination of the Contract on January 1, 1994, prior to making a payout to the Trust, Prudential deducted $1,264,845 as a recoupment of the 1991 deficit.[6] Admittedly, Prudential could have "dipped into" the reserves at the end of 1991, the year in which the deficit occurred. Tr. at 32.[7]

According to Prudential, it chose not to do so because it had at that time entered into discussions with the Trust about obtaining a managed care plan for the Trust's participants. As explained by Prudential, in the hopes of receiving this additional business from the Trust, it had offered not to set off the 1991 deficit in that year's dividend calculation and premium rating process. *See* Hayes Cert., Ex. G (letter from William E. Sweeney, January 23, 1992 [8]). Instead, Prudential proposed that if the Trust purchased a Prudential managed care product, the 1991 deficit would be waived, *see* Hayes Cert. ¶ 19, but if the Contract terminated without the purchase of such a plan, "any surplus would be applied to the [1991] deficit." Hayes Cert. Ex. G.

The Trust acknowledges that Prudential never stated that it was waiving recoupment of the 1991 deficit. *See* Hayes Cert. Ex. W at 42 (Payton Dep.). Indeed, it recognizes that "Prudential hoped to recoup the deficit by offering the Trust a variation in the contract, i.e., a managed care plan." Payton Aff. ¶ 10. The parties, however, never reached agreement on a managed care plan.

Notwithstanding this history, the Trust contends that under the clear and unambiguous terms of the Contract Prudential did not have the authority to deduct the 1991 deficit in determining its final dividend distribution upon termination of the Contract. According to the Trust, Prudential could have offset a deficit in only one of two ways—through the calculation of a dividend during the contract year *in which the deficit occurred,* or by increasing premiums prospectively *the following*

---

6. The figure $1,264,845 represents the amount of the deficit, $1,201,753 ($1,672,983 less the $471,230 paid as an additional premium), plus interest in the amount of $63,092. *See* Def. Mem. Opp'n at 1.

7. "Tr." refers to transcript of oral argument on March 8, 2001.

8. Sweeney was the Director of Group Insurance Marketing at Prudential.

*year.* *See* Pl. Ltr., Jun. 14, 2002, at 1. Because Prudential did neither, the Trust essentially argues that Prudential waived its right to ever recoup the amount of the 1991 deficit. Its position is succinctly set forth, as follows:

> The foundation of plaintiffs' position in this litigation is that neither in the contracts between Prudential and the Trust nor in Prudential's dividend formula is there any provision which authorizes Prudential to recoup a deficit from a previous year except through the calculation of a dividend for that year and the calculation of the premium the following year. Nowhere in the contracts or dividend formula is there any provision which authorizes Prudential to recoup a deficit from prior years, especially where the plan is terminated. Consequently, plaintiff's position on this point is that there is no provision in the contracts or dividend formula which authorized Prudential to make the retroactive deductions it did from the Trust's reserves to make itself whole.

Pl. Ltr., June 14, 2002, at 1.

The Court holds that Prudential was entitled to deduct the deficit that it had carried forward since 1991 from its divisible surplus when it made its final dividend payment after the Contract had been terminated.

Initially, it is necessary to understand the nature of a mutual insurance company and its obligations to its policyholders under a group mutual fund insurance plan. A mutual insurance company is one "in which there is no capital stock and in which the policy holders are the sole owners. [It is a] cooperative enterprise in which members are both insurers and insured, whose business is conducted for benefit of policy holders." Black's Law Dictionary 1021 (6th ed.1990); *see Penn Mutual Life Ins. Co. v. Lederer,* 252 U.S. 523, 533, 40 S.Ct. 397, 64 L.Ed. 698 (explaining that mutual insurance companies "perform[ ] the service called insuring wholly for the benefit of their policy holders"). Because of the nature of the mutual insurance company, its insurance policies are participating policies, meaning "dividends are paid to policyholders based upon company earnings, so that net cost is determined by deducting the amount of such dividends from the gross premiums." 1 Appleman, Insurance Law and Practice, § 9. Consequently, "[i]t is of the essence of mutual insurance that the excess in the premium over the actual cost as later ascertained shall be returned to the policy holder." *Lederer,* 252 U.S. at 525, 40 S.Ct. 397; *see also New York Life Ins. Co. v. Bowers,* 283 U.S. 242, 244, 51 S.Ct. 399, 75 L.Ed. 1005 (1931) (referring to excess premium paybacks of mutual insurance company as dividends). This process has been aptly explained as follows:

> The conventional method of funding a group mutual insurance plan provides that the insured pays a premium, normally on a monthly basis, composed of three elements: (1) anticipated claims (paid claims and incurred claims); (2) a "retention" figure, which is the insurance carrier's cost of doing business (including administrative expenses, state premium taxes, risk charges, profit and interest); and (3) a "margin" to cover the possibility that actual claims may exceed anticipated claims. At the end of each normal policy year the mutual fund insurance carrier's board of directors calculates a dividend, if any[,] that is to be paid to the policyholder. The dividend is arrived at according to an established formula and represents the amount of the premium payments, determined pursuant to the conventional method of funding, that exceeds actual claims paid out by the company plus its retention charge.

*Prudential Ins. Co. v. Miller Brewing Co,* 789 F.2d 1269, 1271 (7th Cir.1986).

"The custom in the mutual insurance industry is to commit the declaration of the dividend to the discretion of the insurance company's board of directors, and its determination cannot be challenged absent a showing of bad faith." *Id.* at 1279 n. 13; *see also Harris Trust & Savings Bank v. John Hancock Mutual Life Ins. Co.,* 767 F.Supp. 1269, 1280 (S.D.N.Y.1991), ("[C]ourts give directors broad discretion as to the determination of dividends and relief will only be given in the event of willful neglect or bad faith.")(citing New York state cases), *aff'd in part and rev'd in part on other grounds,* 970 F.2d 1138 (2d Cir.1992).

In contemplating the payment of a dividend by a mutual insurance company, reference is generally made to the apportionment of "divisible surplus." *See Harris Trust & Savings,* 767 F.Supp. at 1280 (contract with mutual insurance company called for annual apportionment of divisible surplus); *see also Baymiller v. Guarantee Mutual Life Co.,* 2002 WL 1072234 (C.D.Cal. May 7, 2002) ("A participating life insurance policy is one in which the policyholders share pro rata in the annual divisible surplus."); *McCord v. Minnesota Mutual Life Insur. Co.,* 138 F.Supp.2d 1180, 1184 (D.Minn.2001) (participating policy is one in which the policy owner is entitled to share in the company's divisible surplus). Courts have interpreted the concept of divisible surplus to necessarily include the offsetting of deficits. *See Prudential Ins. Co.,* 789 F.2d at 1271 (mutual insurance company will not pay out dividend if the amount of the claims exceed premium payments); *Triscaro v. Union Labor Life Ins. Co.,* 355 F.2d 1, 4–5 (6th Cir.1966) (insurer had the right to offset a deficit against the divisible surplus "under the [insurance] policies as construed within their four corners"); *In re Smith Corona Corp.,* 210 B.R. 243, 247–48 (Bkrtcy.D.Del.

1997) (dividend formula in group contract with mutual insurance company included "certain deficits from prior contract periods").

The Trust does not take issue with these precepts. It does not challenge the basic dividend formula, nor does it argue that Prudential has acted in bad faith or that it cannot offset an annual deficit in a given year in calculating that year's divisible surplus. It simply argues that if Prudential fails to account for a deficit in its annual dividend calculation, the Contract precludes it from carrying that deficit forward and accounting for it in Prudential's final dividend distribution upon termination of the Contract.

The Contract does not support this unconscionable contention. It does not dictate to Prudential how or when it may account for deficits in its annual calculation of divisible surplus. The Contract simply states that whatever divisible surplus Prudential decides to allocate to the Group Contract at each Contract Anniversary will be credited to the Group Contract in calculating its dividend for that year. Clearly, there is nothing in the Contract that required Prudential in the exercise of its good faith discretion to offset a deficit in the year it occurred at the risk of losing the opportunity to recoup the deficit at a later time.

It is difficult to imagine how the Trust has cause to complain. Prudential's decision to defer crediting the 1991 deficit provided the Trust with a larger dividend for that year than it otherwise would have received. The Trust's strained construction of the Contract would afford it a $1,264,845 windfall. It is hornbook law that courts must endeavor to give contracts "a fair and reasonable interpretation[.]" *Cromwell Towers Redevelopment Co. v. City of Yonkers,* 41 N.Y.2d 1, 6, 390 N.Y.S.2d 822, 359 N.E.2d 333 (1976). The

only reasonable interpretation of the Contract is that, regardless of when the deficit occurred, the calculation of dividends could thereafter allow for such offset in any subsequent year. *See, e.g., Reiss v. Fin. Performance Corp.,* 279 A.D.2d 13, 18–19, 715 N.Y.S.2d 29 (1st Dep't 2000) (court will not interpret contract in manner that "defies all bounds of common sense."). Whether a dividend accounted for a deficit in any given year was of no particular significance since the Trust could not expect to receive a windfall merely because a deficit was not credited in that year. *See Wieder v. Skala,* 80 N.Y.2d 628, 637, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992) ("[P]arties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations.") (internal quotation marks omitted).

In any event, the Court will not imply an intent on Prudential's behalf to waive its right to later offset the deficit by not taking the deduction during the year in which it occurred. *See McAllister Lighterage Line, Inc. v. Insur. Co. of North America,* 244 F.2d 867, 871 (2d Cir.1957) (intent to waive must be "plain and unequivocal"); *Seven–Up Bottling Co., Ltd. v. PepsiCo, Inc.,* 686 F.Supp. 1015, 1023 (S.D.N.Y.1988) ("[W]aivers of rights in contract[s] will not be inferred unless the intent to waive is clear.") (citing *Schubtex, Inc. v. Allen Snyder, Inc.,* 49 N.Y.2d 1, 9, 424 N.Y.S.2d 133, 399 N.E.2d 1154 (1979) (Gabrielli, J. concurring)).

Other than broad-based principles of contract law and the general discretionary nature of the power of the board of directors of a mutual insurance company to determine dividends, there is a dearth of specific judicial precedent on the precise question before the Court. Both parties rely on *Triscaro v. Union Labor Life Insur. Co.,* 355 F.2d 1 (6th Cir.1966). There, the trustees protested the insurance company's right to set off a deficit which oc-

curred in 1958 against the divisible surplus of 1959. The applicable contract language, conceptually comparable to the present case, stated: "This policy shall participate annually in the distribution of divisible surplus as ascertained and apportioned by the company at the end of each policy year." *Id.* at 3. The trustees argued that there was no specific authority in that provision authorizing the offset of a deficit of a past year against a current divisible surplus. In rejecting this argument, the court simply noted "that this provision does specifically reserve to the Company the right to ascertain and apportion divisible surplus as to each policyholder, and therefore it reserves to the Company the right to exercise its good faith discretion in the adoption of a formula which provides for offsetting a deficit." *Id.* at 4. Notably, the dividend formula provided that the company could carry deficits forward for four years; nonetheless, the court found this to be irrelevant in the face of the trustees' argument that this particular formula was of no force because it was adopted after the advent of the effective date of the policies, simply stating: "Again, the answer is that the Company had discretion under the terms of the policy to change the formula for ascertaining and apportioning divisible surplus." *Id.* at 5.

In sum, *Triscaro* reinforces the principle that the calculation of the divisible surplus to serve as the basis for the payment of annual dividends vests in the good faith discretion of a mutual insurance company's board of directors. In the absence of express contract language to the contrary, the computation of the divisible surplus can, as an inherent aspect of such discretion, account for existing deficits, regardless of when they accrued.

The Trust, however, relies on a passing comment in *Triscaro* agreeing with the

observation of the trustees therein "that had they cancelled the policies at the end of the deficit year, the Company would have had no right to collect the deficit from them." *Id.* Its reliance is misplaced. This obviously would be the case, as an inherent part of the insurance risk, if there had been no divisible surplus to distribute at the time of termination; it cannot otherwise be the case, lest the Trust receive a windfall.

Accordingly, summary judgment is granted to Prudential dismissing the Trust's first claim.

## II. Claims 3 and 5 and Counterclaim 1: Regulations 145 and 146

In order to understand these claims it is necessary for the Court to set forth the following background information regarding New York State Insurance Regulations 145 and 146. Chapter 501 of the Laws of 1992 was enacted by the State for the purpose of eliminating instability in the individual and small group insurance market caused by experience rating—a system that bases insurance premiums on the insured's prior claims experience. Chapter 501 mandated open enrollment and community rating for all individual and small group health insurance contracts issued in New York. Community rating requires insurance companies to aggregate groups of insureds and base their premiums on the experience of the entire pool, rather than each individual. The legislation, therefore, broadened the availability and affordability of health insurance in New York. Regulations 145 and 146 were promulgated by the Superintendent of Insurance of the State of New York ("Superintendent") to implement the provisions of Chapter 501. *See* N.Y. Comp.Codes R. & Regs. tit. 11, §§ 360, 361 (2000). Regulation 145 clarified the community rating and open enrollment requirements of Chapter 501. Regulation 146, which became effective on April 1, 1993, *see* 11 N.Y.C.C.R.R. § 361.3, cre-

ated two "pools" as a mechanism for complying with the requirements of Chapter 501:(1) the Demographic Pool; (2) the Specified Medical Conditions Pool. Regulation 146 also vested in the Superintendent authority to appoint "a firm ..., other than a carrier participating in any of the pools, to administer the pools...." *Id.* at § 361.5. Pursuant to this authority, the Superintendent appointed Alicare, Inc. ("Alicare"), an affiliate of Amalgamated Insurance Company, as the administrator of both pools; accordingly, requests for reimbursements from the pools had to be made to Alicare.

An insurance company's contribution to the Demographic Pool depends on the specific demographic makeup of its insureds in a specified geographic area ("Pool area") as compared to the insureds of other insurers in the same Pool area. The demographic data for each insured—namely the age, sex and relative morbidity of the insured's participants—is supplied by the insured to the insurer. This data is used by the insurer to create an Average Demographic Factor ("ADF") unique to each insured. Pursuant to a formula set forth in Regulation 146, the insurer then "takes a composite" of the ADFs of each of its insureds in the Pool area and determines its "book of business ADF." Hayes Cert. ¶ 29. The book of business ADF is passed on to the New York State Insurance Department ("NYSID"), which combines it with the book of business ADFs of the other insurers in the Pool area. Based on this information, the NYSID determines an ADF for the entire Pool area, which is called a Regional Demographic Factor ("RDF"). If an insurer's book of business ADF is less than the RDF (meaning that the insureds are presumably younger and healthier than the average in the Pool area), the insurer must contribute to the Demographic Pool. *See* 11 N.Y.C.R.R. § 361.1(e)(1). If an insurer's book of business ADF is greater than the

RDF, the insurer will collect money from the pool. *See id.* The amount of the contribution or collection is directly related to the difference between the insurer's book of business ADF and the RDF. The greater the difference, the greater the contribution or collection.

Contributions to the Specified Medical Conditions Pool are based on specified high cost medical conditions. The purpose of the pool is to protect insurers from the adverse financial effects of covering a disproportionate number of plan participants with such conditions. Each insurer contributes to the pool a pre-set amount per plan participant covered and if its insured (the Trust) seeks reimbursement for payments it has made on behalf of a plan participant for a Special Medical Condition, the insurer (Prudential) must submit the reimbursement claim, on behalf of its insured, to Alicare.

## A. Claim 3: Demographic Pool Contributions

■ Based upon NYSID's estimates of the applicable ADFs and RDFs as of April 1, 1993, Regulation 146 required a number of insurers to then contribute pre-set amounts to the Demographic Pool. All insurers were thereafter to submit updated ADFs on a quarterly basis to Alicare. *See* 11 N.Y.C.C.R.R. § 361.3(g)(1); *see also Curiale,* 64 F.3d at 797 ("Demographic averages are recalculated quarterly to reflect changes in the insurer's subscribers."). The estimates were to be reconciled in May 1994 (and each successive May) based on actual payments, collections, demographic data, and claims incurred during the year; based on such reconciliation, an insurer was to pay addi-

tional amounts to or collect additional amounts from the Demographic Pool.

Based on Prudential's book of business ADF, it was one of the insurers required to make an estimated contribution to the Demographic Pool. At the time Prudential filed with the NYSID for approval of its 1993 premium rates for the Trust, it estimated that its 1993 contribution to the Demographic Pool on account of the Trust would total $245,103. *See* Specht Cert. ¶ 9.[9] Upon termination of the Contract, this amount was deducted from the reserves prior to paying dividends. The Trust does not dispute that a payment to the Demographic Pool was required; however, it argues that the ADF that Prudential used to calculate that contribution was not based on the requisite quarterly updates. At oral argument, Prudential acknowledged that the Trust was correct, *see* Tr. 46–52, and the parties subsequently agreed that the appropriate measure of damages the Trust suffered based upon Prudential's failure to properly calculate its Demographic Pool contributions was $169,493. *See* Pl. Ltr., June 14, 2002; Def. Ltr., June 14, 2002; *see also Kohler v. Inter–Tel, Inc.,* 244 F.3d 1167, 1170 n. 3 (9th Cir.2001) (citing *United States v. Wilmer,* 799 F.2d 495, 502 (9th Cir.1986) (attorney's statement during oral argument constitutes judicial admission)) Accordingly, summary judgment is granted for the Trust on its third claim in this sum, together, in the exercise of the Court's discretion, with pre-judgment interest at the rate of 9%. *See* N.Y.C.P.L.R. § 5001 (court has discretion to grant pre-judgment interest); § 5004 (pre-judgment interest should be set at 9%). Interest shall run from January 1, 1994.[10]

---

**9.** Specht was employed with Prudential as a senior underwriter in the underwriting unit from 1994 to 1999.

**10.** Interest should be paid from January 1, 1994 because "when Prudential finally paid

the Trust the balance of the reserves ... it included interest only through December 31, 1993." Pl. Ltr at 2, June 14, 2002. Prudential argues that interest should run from "the date the second and final installment of the 1993 dividend was made, [September 5,

## B. Claim 5 and Counterclaim 1: Adjusted RDF

■ In May 1994, when the NYSID was performing its required annual reconciliation pursuant to the regulations, it determined that it had underestimated the RDF for 1993 and issued a revised RDF. If this RDF had been in effect in 1993, the Trust's contributions to the two pools in 1993 would have been considerably higher. Prudential had previously deducted $715,673 from its final dividend distribution in September 5, 1995 as a retroactive recoupment of the adjusted RDF. Using this revised RDF, which it learned of after September 5, 1995, Prudential recalculated its required 1993 contributions for the pools and determined that they should have totalled $1,102,996 ($994,436 for the Demographic Pool plus $108,560 for the Specified Medical Conditions Pool). *See* Specht Cert. ¶ 12.

The Trust contends that Prudential was not entitled to recoup the $715,673 for the adjusted RDF. Prudential disagrees, and counterclaims for $ 387,323 because it mistakenly deducted only $715,673, rather than the full $1,102,996.[11]

### 1) Claim 5

The Trust contends that this claim is governed exclusively by Regulation 145, which states, in relevant part:

An insurer may only charge a small group or an individual the community rate as approved by the superintendent. The only exception shall be in the event

an insurer renders a rate quote to the group prior to the date the insurer receives the superintendent's written approval of that rate, and in that instance the rate quoted to the group may only be the proposed rate as submitted by the insurer to the superintendent and which is pending approval before the superintendent. *In the event the rate approved by the superintendent varies from the rate the insurer proposed to the superintendent and quoted to the group, the variance must be reconciled at the next premium renewal date using a prospective adjustment.*

11 N.Y.C.C.R.R. § 360 (emphasis added). The Trust argues that this language prevents Prudential from retroactively expensing an adjustment by the State to the RDF by deducting it from the divisible surplus; rather, it argues, Prudential's exclusive remedy was to adjust premiums going forward. Because the Contract terminated and Prudential would not receive further payments, the Trust claims that Prudential was precluded from recovering this amount.

According to Prudential, Regulation 145 is inapplicable and the Court must look to Regulation 146, which permits insurers to pass through to their individual and small group policy holders their respective share of Prudential's pool contributions by treating it as a claim expense. *See* Hayes Cert. ¶ 35. Regulation 146 states, in relevant part:

---

1995], . . . . [because] [i]t was not until after this date that it could be claimed that the dividend payment was inaccurate." Def. Ltr at 4, June 14, 2002. The Court concludes that the Trust should receive the same amount of interest on this claim as it would have had Prudential not made its miscalculation. The Court notes that the Clerk's office, which will calculate the prejudgment interest, will do so on an annually compounded basis.

**11.** As the Trust points out, the counterclaim actually seeks $381,041; accordingly, it contends that Prudential should be bound by this sum. *See* O'Reilly Ltr. (Jun. 14, 2002) ¶ 3. Prudential explains, however, that a reconciliation by Alicare that occurred subsequent to the counterclaim places the final figure at $387,323, *see* Kelly Ltr.(Jun.14, 2002) at 3, a number not disputed by the Trust. The Court will deem the counterclaim to be amended to reflect the accurate sum.

Insurers and HMOs which are expected to make contributions are permitted to include their projected contributions in their premium rates as if the contributions were claim expenses, while insurers and HMOs which are expected to receive money shall treat the projected receipts as if they were offsets to claims and thus reduce premium rates below what those premium rates would otherwise need to be.

11 N.Y.C.C.R.R. § 361.1(e)(1). Prudential argues that the regulation, read in conjunction with a January 1994 Circular Letter issued by the NYSID stating that "each carrier . . . should treat such [pool contributions] as if they were claim expenses," permitted Prudential to take the deduction for the adjusted RDF. Hayes Cert., Ex. K (N.Y.SID Circular letter, Jan. 31, 1994).

The Court agrees that the RDF pool contributions should, as recognized by the NYSID, be treated as claims expenses. *See Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (noting that an agency's interpretation of its own regulations are "controlling unless plainly erroneous or inconsistent with the regulation.") (internal quotation omitted); *Colonial Life Ins. Co. v. Curiale*, 205 A.D.2d 58, 617 N.Y.S.2d 377, 379 (3d Dep't 1994) (N.Y.SID's interpretations of its own Regulations entitled to "great deference because of [its] special competence and expertise"). As such, Prudential cannot be deemed to have acted in bad faith in crediting these sums against its divisible surplus in calculating its final dividend. That Regulation 145 authorizes recoupment of these expenses via a prospective premium adjustment does not mean that they cannot otherwise be offset against divisible surplus. Notably, neither the regulation nor the Contract addresses the means or method for accounting for these expenses upon termination. *See* 11 N.Y.C.C.R.R. § 360; Hayes Cert., Ex. A (Contract).

"When the parties to a . . . contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1979); *see Barnes v. Gorman*, 536 U.S. 181, 122 S.Ct. 2097, 2102, 153 L.Ed.2d 230 (2002) ("reasonably implied contractual terms are simply those that comport with community standards" (internal quotation marks and citation omitted)); *Haines v. City of New York*, 41 N.Y.2d 769, 772, 396 N.Y.S.2d 155, 364 N.E.2d 820 (1977) (supplying omitted term and finding implied intention that performance under contract will be for a reasonable time); *Reiss*, 279 A.D.2d at 13, 715 N.Y.S.2d 29 (omission of essential term regarding effect of stock splits required court to supply reasonable term regarding proportional adjustment of number of shares that may be purchased and their price). The only reasonable view of the parties' rights and duties under the circumstances is to sanction the recoupment of these expenses by Prudential in the calculation of its divisible surplus upon the termination of the Contract. As the Court noted at oral argument, "[t]his was an anticipatory type of expense. There was an initial estimate subject to revision. The revisions were made. It would be a windfall for [the Trust] if you did not properly contribute to that." Tr. at 56. Accordingly, that aspect of Prudential's summary judgment motion seeking dismissal of the Trust's fifth claim is granted.

## 2) Counterclaim 1

In respect to Prudential's counterclaim for $387,323, based on its assertion that this sum mistakenly was not deducted from the final dividend, the Trust argues that it would be unjust to compel a refund because repayment would constitute an in-

equitable hardship to the Trust.[12] In that regard, the Trust contends that "[a]ll of the money ... has been expended in the payment of claims and administrative expenses of the Trust." Pl. Mem. Opp'n at 6. In response, Prudential contends that detrimental reliance, or estoppel, is an affirmative defense that the Trust waived by not raising it in its reply.

 It has long been the rule in New York that "money paid under a mistake of fact may be recovered back, however negligent the party paying may have been in making the mistake, unless the payment has caused such a change in the position of the other party that it would be unjust to require him to refund." *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 366–67, 568 N.Y.S.2d 541, 570 N.E.2d 189 (1991). "[A]n error of fact takes place either when something which really exists is unknown, or some fact is supposed to exist which really does not exist." *DeWolff v. Howe*, 112 A.D. 104, 98 N.Y.S. 262, 264 (1st Dep't 1906). A mistake of fact claim will prevail unless the opposing party can prove that it justifiably relied on the mistake "and, in consequence, suffered a prejudicial change in position." *Securities Settlement Corp. v. Jachera*, 772 F.Supp. 770, 773 (S.D.N.Y. 1991). Such detrimental reliance is an af-

firmative defense that must be raised in a responsive pleading. *See* Fed. R. Civ. Proc. 8(c); 5 C.Wright & A. Miller, Federal Practice & Procedure § 1278 (2d ed.1990). Failure to do so results in " 'the waiver of that defense and its exclusion from the case.' " *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir.1984) (quoting Wright & Miller). The Trust has not alleged detrimental reliance as an affirmative defense. *See* Pl's Reply Countercl.

 Even assuming, *arguendo*, that the Trust did not waive this affirmative defense, it would be meritless. "The elements of detrimental reliance are 'lack of knowledge of the true facts, good-faith reliance, and a change of position.' " *Id.* (quoting *Holm v. C.M.P. Sheet Metal, Inc.*, 89 A.D.2d 229, 235, 455 N.Y.S.2d 429 (4th Dep't 1982)). "A change of position is not cognizable unless the change is irrevocable, or the status quo can not be restored without expense." *Jachera*, 772 F.Supp. at 774. The mere fact that the payee has spent the money is not determinative of whether there has been a change of position. Even where the money has been used to pay living or business expenses, or as a gift, the payee has not changed its position "unless such expenses were incurred or gifts made because of the receipt

---

**12.** The Trust also contends that Prudential should have asserted a pre-litigation demand for return of the funds before asserting its counterclaim; however, it is questionable whether a demand is necessary in the context of a counterclaim for overpayment. *See Sharkey v. Mansfield*, 90 N.Y. 227 (1882) (demand is not a condition precedent to a defendant's right to assert a counterclaim for overpayment where "the party receiving the money, instead of acting ... under an honest mistake, knows the whole truth and consciously receives what does not belong to him"); *Leach v. Vining*, 18 N.Y.S. 822, 823–24 (1892) (noting that "there is some question whether this rule would apply to the case of a defendant setting up overpayment by way of counterclaim"). *But see Dubin v. Dubin*, 174 Misc. 952, 22 N.Y.S.2d 246, 248 (N.Y.Sup.Ct.1940) (requiring demand before asserting counterclaim in marital action). In any event, the Court concludes that under the facts and circumstances of this case, the nature of the litigation, and in light of the federal compulsory counterclaim rule, *see* Fed.R.Civ.P. 13(a), a pre-litigation demand requirement here would be inappropriate. *See* 66 Am.Jur. *Restitution and Implied Contracts* § 92 (2d ed.1973); *see also* 1 N.Y. Jur. *Actions* § 6 (2d ed.1979) (the purpose of a demand is to settle the claim agreeably "without an action at law"); 1 N.Y. Jur. *Actions* § 6 (where demand would be impossible, useless, or futile, it is not necessary); *see also Loew v. Interlake Iron Corp.*, 270 A.D. 858, 60 N.Y.S.2d 772, 773 (2d Dep't 1946); Fed.R.Civ.P. 13(a) (claims which have accrued or matured at the time of pleading are compulsory).

of the mistaken payment." *Id.* (internal quotation omitted); *see also Castock Corp. v. Bailey,* 128 Misc.2d 1068, 492 N.Y.S.2d 921 (N.Y.Sup.Ct.1985) (change of position not a defense when defendant used money to discharge debt or make expenditures otherwise required). The Trust claims that it changed its position by spending the money on business expenses; this is insufficient to establish detrimental reliance. Prudential, therefore, is entitled to recover on this counterclaim.[13] In the exercise of its discretion, the Court does not grant pre-judgment interest. *See* N.Y.C.P.L.R. § 5001.

## V. Claim 9: Kulakowski Claim

 On June 14, 1994, at the Trust's request, Prudential submitted a claim to Alicare on behalf of the Trust for reimbursement from the Special Medical Conditions Pool for $120,000 for benefits paid by the Trust for Marcia Kulakowski ("Kulakowski"), a Trust participant. Kulakowski received a bone marrow transplant for acute leukemia sometime in March 1993. Pursuant to Regulation 146, acute leukemia is a special medical condition. Prudential's request for reimbursement was denied by Alicare on the ground that Regulation 146 required that the transplant be performed on or after April 1, 1993, the effective date of Regulation 146. The Trust contends that Prudential "failed and refused to appeal [Alicare's] decision, although [the Trust requested that Prudential do so] and [Prudential] [was] the only entity with standing to do so. As a result of [Prudential's] willful failure and refusal to appeal [Alicare's] erroneous denial of the reimbursement claim, the Trust has been deprived of reimbursement of Trust funds." Complaint ¶ 44. While Claim 10, which the Court dismissed, alleged a

breach of fiduciary duty under ERISA, Claim 9 alleges a breach of fiduciary duty under state law. *See* Complaint at ¶¶ 40–45.

Although "the general rule [is] that the relationship between the parties to a contract of insurance is strictly contractual in nature." *Batas v. Prudential Ins. Co.,* 281 A.D.2d 260, 264, 724 N.Y.S.2d 3 (1st Dept. 2001), "there are instances where a fiduciary relationship springs into existence as a result of the dealings between an insurer and its insured." *Rabouin v. Metropolitan Life Ins. Co.,* 182 Misc.2d 632, 634–35, 699 N.Y.S.2d 655 (N.Y.Sup.Ct.1999). In asserting that Prudential owed a duty to the Trust to prevail upon Alicare to utilize funds from the Special Medical Conditions Pool to satisfy the Kulakowski claim, the Trust invokes this exception to the general rule. *See Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir.1991) (noting that a fiduciary relationship exists "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation") (quoting *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 168, 521 N.Y.S.2d 672 (1st Dep't 1987)); 7C Appleman, Insurance Law and Practice § 4711 at 378; § 4712 at 448 (characterizing the duty owed by the insurer to its insured in the settlement of third-party claims as "somewhat of a fiduciary one," explaining that "[a]s the champion of the insured, [the insurer] must consider as paramount his interests, rather than its own"); *cf. Hartford Acc. & Indem. Co. v. Michigan Mut. Ins. Co.,* 93 A.D.2d 337, 462 N.Y.S.2d 175 (1st Dep't 1983), *aff'd* 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984) (finding that a fiduciary relationship is created when insurance company is called on to

---

**13.** The Court notes that there was sufficient divisible surplus at the time Prudential made its final dividend payment on September 5, 1995 to offset the additional $387,323; thus, the Court is not presented with a situation where the offset would exceed the divisible surplus. *See Triscaro,* 355 F.2d at 5.

provide a defense to its insured). Assuming Prudential owed such a duty to the Trust, Prudential fulfilled its fiduciary responsibilities.

Under New York law, a fiduciary must exercise " 'such diligence and such prudence in ... care and management, as in general, prudent men of discretion and intelligence in such matters, [would] employ....' " *See Bank of New York v. Koenig,* 35 N.Y.2d 512, 518, 364 N.Y.S.2d 164, 323 N.E.2d 700 (1974); *see also In the Matter of Estate of Donner,* 82 N.Y.2d 574, 585, 606 N.Y.S.2d 137, 626 N.E.2d 922 (1993); *In Re Clark's Will,* 257 N.Y. 132, 136, 177 N.E. 397 (1931); *In the Matter of Hahn,* 93 A.D.2d 583, 586, 462 N.Y.S.2d 924 (4th Dep't 1983).

As previously noted, the pooling contribution requirements of Regulation 146 became effective April 1, 1993, and the Superintendent chose Alicare as administrator of the Special Medical Conditions Pool. In carrying out its duties as pool administrator, Alicare utilized Regulation 146's effective date as the operative date for reimbursement claims. In that regard, Alicare issued a document outlining "Procedures for Submitting a Request for Reimbursement from the Specified Medical Conditions (SMC) Pool." Hayes Cert., Ex. P ("Procedures Manual"). The manual stated that "in order [for a transplant] to qualify for reimbursement from the pool ... [t]he transplant must have occurred on or after April 1, 1993." *Id.* In response to comments by carriers, a document in Question and Answer ("Q & A") form was included with the Procedures Manual to illustrate the requirements for obtaining reimbursement. In that document, Alicare stated that "[o]nly expenses incurred on or after April 1, 1993 are recognized (and only if the [pro-

cedure] occurred on or after April 1, 1993)." *Id.*

Prudential scrupulously reviewed the Kulakowski claim. It considered the Procedures Manual and Q & A, and a letter it received from Alicare rejecting the claim because "the actual transplant was performed prior to April 1, 1993." Hayes Cert., Ex. T (correspondence between Alicare and Prudential). Prudential sent a letter to the Trust, enclosing this letter from Alicare, and explained that "after reperusing the file, extensive discussions with the underwriters and a telephone conversation with a representative of [Alicare]," it agreed with Alicare's decision; consequently, it informed the Trust in that letter that there was not "much room for an official appeal of the decision." *Id; see also* Cimino Cert. ¶ 7 [14] (explaining Prudential's internal review process and analysis of the Kulakowski claim).

There is no question that Prudential diligently considered the propriety of Alicare's decision and conscientiously assessed the merit of any possible appeal. Prudential did as much, if not more, than any prudent person of discretion and intelligence in like circumstances would have employed.

The Trust, nonetheless, argues that Prudential should not have acquiesced in Alicare's decision because Regulation 146 states that "incurred claims (or claims incurred) means all policy and Contract claims settled, or medical expenses paid during a particular period." 11 N.Y.C.R.R. § 361.2(I)(emphasis added). Taking this language literally, the Trust seemingly contends that it is entitled to reimbursement since the medical bills underlying Kulakowski's claim were paid after April 1, 1993, even though the medical procedure transpired prior to that date.[15]

---

14. Cimino was the regional health policy coordinator for Prudential from 1994 to 1996.

15. The record does not reveal when the bill for the Kulakowski procedure was rendered to the Trust, nor when the Trust made pay-

*See* Pl. Mem. at 14. Alicare, however, did not subscribe to such a literal reading of the Regulation; rather, as reflected in its Procedures Manual and Q & A, it adhered to its understanding that Regulation 146 required, as a prerequisite to reimbursement for bills rendered and paid for special medical services covered by the pool, that such services be rendered after the effective date of the Regulation. This was an entirely reasonable construction of the Regulation lest insureds be permitted to obtain reimbursement from the pool by the simple expedient of arranging for the withholding of the payment of medical expenses until after the effective date of the Regulation. As the appointed agent of the Superintendent, this interpretation of the Regulation was entitled to deference. *See Curiale,* 617 N.Y.S.2d at 379 (N.Y.SID's interpretations of its own Regulations entitled to "great deference because of [its] special competence and expertise"); *cf. Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 73 (2d Cir.1998) (noting that private insurance carrier that contracted with federal agency to administer Medicare programs stands in shoes of agency as to immunity from suit). Thus, Prudential reasonably deferred to Alicare's interpretation of the Regulation. In any event, even if Prudential's assessment of the merit of the claim was incorrect, this would not necessarily equate to a breach of a fiduciary duty. *See In Re Clark's Will,* 257 N.Y. at 136, 177 N.E. 397 ("[I]t is impossible to say that trustees are wanting in sound discretion simply because their judgment turned out wrong." (internal quotation

marks omitted)). Accordingly, the Trust's Ninth Claim is dismissed.[16]

## VI. Counterclaim 2: Run–Out Claims

■ Pursuant to the terms of the Contract, Prudential was required to pay claims for medical services incurred by Trust participants prior to termination of the Contract that were not billed until after the effective date of termination ("run-out claims"). Prudential asserts that subsequent to paying out the dividend, it became aware of approximately $471,612.11 for such outstanding claims. Hayes Cert. ¶ 54. It contends that this amount could have properly been included as claims expenses in Prudential's 1993 year-end dividend calculations; therefore, it asserts a counterclaim for this sum.

Prudential used a third-party, Premier Benefits Management ("Premier"), to process and pay claims submitted by the Trust. As a matter of practice, Prudential would pay run-out claims up to 18 months after a contract terminated; accordingly, Premier was authorized to pay claims of Trust participants until June, 1995. Premier went out of business in March 1995. Prudential took over the processing of the claims and extended the time frame until September 1995. Premier apparently used a voucher (non-computerized) system for processing the claims. Because the claims were previously processed and paid by Premier, Prudential continued to use the voucher system. At the time of Prudential's final dividend payment on September 5, 1995, these vouchered claims were not in Prudential's computer system;

ments for the procedure; however, the parties agree that all payments were made after April 1, 1993.

**16.** Dismissal of the Kulakowski claim would also have been warranted even if the Tenth claim had not been dismissed and Prudential were deemed to be an ERISA fiduciary since

the standards of fiduciary duty under ERISA are more deferential than the State standard. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 102, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (applying arbitrary and capricious standard of review to fiduciaries under ERISA).

consequently, they inadvertently were not included in the amount deducted for claims expenses. Prudential contends that it is entitled to be reimbursed for this inadvertent mistake since the Trust has been unjustly enriched.

The Trust claims that Prudential should be precluded from seeking reimbursement because it could have included the claims in its final reconciliation if it had been more diligent. *See* Payton Aff. Opp. ¶ 4. In addition, the Trust contends that it would be unjust to compel a refund since repayment would constitute an unfair and inequitable hardship to the Trust; it also again raises as an affirmative defense, as it did in respect to Prudential's first counterclaim, Prudential's failure to make a pre-litigation demand. In any event, the Trust claims that Prudential has not submitted sufficient evidence establishing that it paid these claims. *Id.* at ¶ 5.

The Court will not bar Prudential from recovering payment for these claims because of its alleged negligence; nor, as with the first counterclaim, will it bar recovery because of alleged undue hardship or by reason of the absence of a pre-litigation demand.[17] However, unresolved issues of material fact regarding payment of these claims preclude summary judgment. Prudential submits a three-page summary of claims that were approved for payment and vouchered. The chart includes the name of the beneficiary, the date of service, the provider, the charge, and the amount paid. The Trust contends that it has not received any explanations of benefits ("EOB") or provider bills; without EOBs, it can not determine whether the claims were properly paid since EOBs indicate the "subject of the claim and the treatment provided for such condition or illness." *Id.* The Court determines that

Prudential's submission of an undated, three-page summary of claims allegedly paid on behalf of the Trust is insufficient to establish, as a matter of law, that it is entitled to reimbursement of these claims.

Accordingly, summary judgment is denied with respect to Prudential's second counterclaim.

## CONCLUSION

Summary judgment is granted for Prudential dismissing the First, Fifth and Ninth claims. Summary judgment is granted for Prudential on its First Counterclaim in the sum of $387,323, without prejudgment interest. Summary judgment is granted for the Trust on its Third Claim for $169,493, with prejudgment interest at the rate of 9% from January 1, 1994. Summary judgment with respect to Prudential's second counterclaim is denied.

**SO ORDERED.**

---

**17.** The Court notes that there was sufficient divisible surplus to offset this claim. *See* fn. 14, *supra*.